Keystone Water Company, White Deer District, Appellant, *v.* Pennsylvania Public Utility Commission, Appellee.

294

Argued January 7, 1975, before President Judge BOWMAN and Judges CRUMLISH, JR., KRAMER, WILKINSON, JR., MENCER, ROGERS and BLATT.

*Ernest R. vonStarck,* with him, of counsel, *Morgan, Lewis & Bockius,* for appellant.

*Philip R. Mann,* Assistant Counsel, with him *Edward Munce,* Acting Counsel, for appellee.

OPINION BY JUDGE KRAMER, May 27, 1975:

This is an appeal filed by Keystone Water Company —White Deer District (formerly and during the entire record made herein known as White Deer Mountain

Water Company, hereinafter referred to as Keystone) from an order of the Pennsylvania Public Utility Commission (PUC), dated April 17, 1974, setting forth findings of fact and conclusions of law concerning a proposed rate increase by Keystone. The Commission's order contains complicated facts, statistics, and data such as are normally involved in a public utility rate case.

This case had its genesis on April 29, 1969, when Keystone filed an amendment to its tariff providing for increases in all metered water rates, except public fire protection. After hearings the PUC issued its long-form order, dated September 28, 1971, which order was appealed by Keystone to this Court at Nos. 934 and 941 C. D. 1971, apparently because the PUC had excluded from its findings of fair value the cost of a new filtration plant (the same issue which is the subject of the instant appeal). Upon request of the PUC, the case was remanded for the purpose of taking further evidence. At the subsequent hearing it was agreed among all the parties that the record should have incorporated into it the entire record made in the prior proceedings. As a result of these developments, on August 31, 1972, Keystone filed a further supplement to its tariff proposing certain changes under which it proposed to increase its annual operating revenues by $415,477, approximately a 48 percent increase, based upon the level of its operations for the test year ending April 30, 1972. The PUC suspended the effective date of the proposed changes to August 22, 1973, after which time Keystone collected under the proposed rates as temporary rates subject to refund. Because of the very narrow issue presented by this case, we need not go into all the details of the PUC's adjudication except to note that the final order permits a total annual increase in revenues of $365,450 from Keystone's 7,400 customers in Union and Northumberland counties.

To understand the narrow issue involved in this case, it is necessary to describe Keystone's operation. For al-

most 75 years, one of the three sources of water for Keystone was the White Deer Creek watershed (watershed). The area of the watershed above Keystone's intake point is approximately 37 square miles. The watershed was almost entirely forest land and Keystone owned about 1,300 acres in fee. Approximately 10 percent of the watershed is owned by the Commonwealth and is maintained as state forest land. For the remaining 90 percent, Keystone holds deeds granting water rights dating back to about 1902, wherein it is stated that Keystone has the complete control and use of all the waters and even the right to enter upon the lands at all times for the purpose of maintaining its supply of water. This water was so pure that it required no treatment other than the minimal chlorination required by the Department of Health for all public water companies. In 1959 Keystone became aware that the Commonwealth proposed to construct Interstate Highway I-80 through the valley of the White Deer Creek.[1] Keystone advised the Pennsylvania Department of Transportation (PennDOT) of the danger to its water supply but was unsuccessful in attempting to have I-80 rerouted so as not to touch the watershed. As a result of long, involved negotiations with PennDOT concerning Keystone's condemnation rights, an understanding was reached and reduced to a written agreement dated July 18, 1966. It is well to note at this point that the PUC was not in any way involved in these negotiations.

The July 18, 1966 agreement includes the following provisions:

"WHEREAS, the construction and improvement of Sections 74, 75 and 76 of said State highway will require the taking by Commonwealth for highway purposes of approximately one hundred thirty (130)

---

1. We know from prior cases that if a private individual had intended to pollute a watershed such as this, the Commonwealth of Pennsylvania probably would have enjoined him.

acres of the said lands belonging to the Company and *will seriously impair the water rights over the balance of the Company's land in said watershed area required for the protection of the waters of White Deer Creek;* and,

"WHEREAS, it has been agreed between Commonwealth and the Company that the *just compensation,* to which Company is entitled *by reason of said taking of its land, the impairment of its water rights as aforesaid and the cost to insure the continuance of the supply of potable water to the said communities which Company serves, is one million three hundred thousand ($1,300,000.00) dollars,* which is to be made payable in accordance with the terms and conditions hereinafter set forth in this agreement." (Emphasis added.)

The agreement sets forth that the Commonwealth would acquire by deed 130 acres of land owned by Keystone.[2]

Our review of this agreement permits us to conclude that PennDOT was negotiating a settlement under condemnation principles. In the agreement Keystone agreed "at its own cost and expense" to commence the preparation of plans and designs for construction of necessary filtration facilities to insure the continued purity of the water in White Deer Creek. The filtration plant was to be constructed within about 15 months. The Commonwealth of Pennsylvania was to pay Keystone the $1,300,-000, immediately upon receipt of the executed deed for

---

2. The record contains a PennDOT memorandum, concerning items to be covered in the agreement, which contains the following paragraph:

"6. The damages are to be $1,300,000, which include, cost to cure on the stream, and the taking of approximately 130 acres of the Water Company land.

"Note: The District Office appraisal on the land damages is $3,900."

the 130 acres of land and notice that Keystone had awarded a contract for the construction of the filtration facilities. PennDOT agreed that it would not commence construction of the highway, so as to affect the watershed, until the filtration plant was in operation. After settlement, which was made March 30, 1967, the company signed a "Receipt and Acquittance" in which it acknowledged receipt of the money "for the taking" of the land, "for the impairment of its water rights within the water shed area," and "for insuring the continuance of the supply of potable water to the communities served by it."

The new filtration plant went into service in the spring of 1968, and its final construction cost was $1,100,-000. The record indicates that there were additional costs, but these were not specifically stated. In any event, both the PUC and Keystone agree in their argument that $1,300,000 was utilized by Keystone for this purpose and so we will accept that figure. The record also shows that the annual operating expense of this plant amounts to approximately $50,000 a year. There was no provision in the agreement between Keystone and PennDOT concerning the operating expenses.

This bit of background is necessary for the reason that in the rate case adjudication (both September 28, 1971 and April 17, 1974) the PUC excluded $1,292,347 from the fair original cost and fair value of Keystone's plant which amount represents the $1,300,000 less the PUC's allowance of $2,609 representing its finding of the value of the 130 acres taken, plus $5,044 of other expenses. In other words, the PUC removed $1,292,347 from the rate base of Keystone for ratemaking purposes. We note that although the PUC, in its adjudication, states that it removed this amount from the fair value, technically that is not correct. They, in effect, removed it from original cost, which is only one of several criteria utilized for determining fair value. As a result of this adjustment, the PUC also disallowed approximately

$12,000 a year in annual depreciation based upon the original cost of the filtration plant in question.

The Commission's reasoning was that, based upon equitable principles, it could not "permit . . . [Keystone] to receive all of the salutary effects of the land condemnation and pass them on to the stockholders while passing on all of the deleterious effects of the condemnation to the rate-payers." The PUC garnered from the terms of the agreement of July 18, 1966 an intent on the part of PennDOT to benefit the consumers of Keystone. The PUC stated:

> "Indeed, it is obvious from the terms of the agreement . . . that the major consideration was the need to insure the potability of . . . [Keystone's] White Deer Creek source of supply."

It concluded that with the exception of the minimal amount of dollars represented by the value of the land (which is non-depreciable for accounting or rate-making purposes) and minimal expenses, the balance of the $1,300,000 was for "consequential damages to the rate-payer's service." While counsel for the PUC makes an appealing argument that the rate payers are asked to pay twice for this property, once through the condemnation settlement and once through rates, upon complete analysis, the argument cannot be supported legally and, therefore, we believe the order of the PUC must be reversed.

We have stated many times that this Court's scope of review is limited both by statute and prior case law. Section 1107 of the Public Utility Law (Act), Act of May 28, 1937, P.L. 1053, *as amended*, 66 P.S. §1437, provides in pertinent part:

> "The order of the commission shall not be vacated or set aside, either in whole or in part, except for error of law or lack of evidence to support the finding, determination, or order of the commission, or violation of constitutional rights. . . ."

See *Lower Paxton 'Township v. Pennsylvania Public Utility Commission,* 13 Pa. Commonwealth Ct. 135, 317 A. 2d 917 (1974) ; *Pennsylvania Power & Light Co. v. Pennsylvania Public Utility Commission,* 10 Pa. Commonwealth Ct. 328, 311 A. 2d 151 (1973) and *Philadelphia Suburban Transportation Company v. Public Utility Commission,* 3 Pa. Commonwealth Ct. 184, 281 A. 2d 179 (1971).

The basic and narrow issue confronting us is whether the dollars representing the investment in the new filtration plant should be included in Keystone's rate base for rate-making purposes. We hold that it should be included.

We should immediately emphasize that this is *not* a condemnation case such as was involved in *Pennsylvania Gas & Water Company v. Pennsylvania Turnpike Commission,* 428 Pa. 74, 236 A. 2d 112 (1967). That case, however, is noteworthy and has been cited by both parties, because our Supreme Court held that due to "somewhat unique circumstances" a departure from the traditional test of utilizing fair market value before and after the taking by government would be permitted, in which event the "replacement value or repair test" could be used as a measure of damages. In that case, the government condemned a portion of property which had been held for many years in reserve for the use of a water reservoir. The portion which was taken was that portion where the dam had been planned to be built. In effect, the majority of our Supreme Court permitted a recovery of damages based upon construction costs to build the reservoir as it was intended prior to the taking. The instant case is a rate case, not a condemnation case.

Sections 301-313 of the Act, 66 P.S. §§1141-1153, give directions to the PUC to be used in the establishment of just and reasonable rates, but none of these sections specifically states what is to be included within the term

"fair value." We are guided, however, by the pronouncements of our Supreme Court in *Scranton v. Scranton Steam Heat Company,* 405 Pa. 397, 176 A. 2d 86 (1961), the facts of which are analogous to this case. There the Scranton Steam Heat Company had purchased the steam heat service facilities of a combination electric and steam utility for $250,000. Although the facilities purchased had an original cost of $2,200.00, they had a much greater reproduction cost. The PUC in that case rejected both the original cost and reproduction cost statistics presented and fixed its fair value on the acquisition cost alone. Our Supreme Court, in sustaining the Superior Court's reversal of the PUC, stated:

> "Acquisition cost is not and never has been in Pennsylvania the criterion of 'fair value' or a substitute for either or both the factors of original cost of construction or reproduction cost. . . ." (Citations omitted.) 405 Pa. at 402-403, 176 A.2d at 89.

The *Scranton* Court also stated:

> "More than half a century ago it was held that 'the basis of all calculations as to the reasonableness of rates to be charged . . . must be the fair value of the property being used by it for the convenience of the public. . . . What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience' . . . ." (Citations omitted.) 405 Pa. at 401, 176 A.2d at 88.

The Court then went on and noted that fair value for rate-making purposes has a connotation peculiar to rate proceedings, and that there is no precise formula by which the Commission is bound in fixing the rate base. The question before us in this case, however, is not whether the value allowed for rate-making purposes by the PUC was one of several possible valuations, but rather, whether the PUC's action in entirely eliminating this piece of property from the rate base was proper.

At the very root of this issue there are certain fundamental constitutional rights involved. Both the Fifth and

Fourteenth Amendments to the United States Constitution and Article I, sections 9 and 10 of the Pennsylvania Constitution of 1968 provide that no person may be deprived of his property without due process of law and that private property may not be taken or applied to the public use without just compensation. These principles are as old as the Magna Charta. Our Pennsylvania Supreme Court has affirmed these principles at every opportunity. *Andress v. Zoning Board of Adjustment*, 410 Pa. 77, 188 A. 2d 709 (1963) ; *Lord Appeal*, 368 Pa. 121, 81 A. 2d 533 (1951) ; and *White's Appeal*, 287 Pa. 259, 134 A. 409 (1926). In applying these constitutional principles to public utility regulation, the appellate courts of this Commonwealth have stated over and over again that the rates set by the Commission must not be confiscatory. It has been held that confiscation results when the order of the Commission refuses the utility company an opportunity to earn a fair return upon the fair value of its property devoted to the public service. *See Ben Avon Borough v. Ohio Valley Water Co.*, 271 Pa. 346, 114 A. 369 (1921) ; *Pittsburgh v. Pennsylvania Public Utility Commission*, 182 Pa. Superior Ct. 551, 128 A. 2d 372 (1956); *Solar Electric Co. v. Pennsylvania Public Utility Commission*, 137 Pa. Superior Ct. 325, 9 A. 2d 447 (1939) ; and *Beaver Valley Water Co. v. The Public Service Commission*, 76 Pa. Superior Ct. 255 (1921), aff'd. 271 Pa. 358, 114 A. 373 (1921). In this case Keystone is a public utility and is required by law to provide adequate and continuous water service to its customers. To explain our conclusion that the Commission violated these basic principles and thereby committed an error of law, we turn now to a discussion of what the Commission did in this case.

The PUC stated in its adjudication that the result of its elimination of any value for the filtration plant from the rate base equitably establishes "the pre-condemnation status quo, [that is that] both the utility and its cus-

tomers must be made whole insofar as reasonably possible." But the facts of the case do not support that conclusion. Prior to the taking by PennDOT, Keystone had acquired deeded rights to the pure water in almost all of this 37-square-mile watershed. Those rights had value. True enough, those rights were carried on the books of Keystone at what appears to be nominal evaluation because the value was set in 1902 when a dollar purchased much more than it does today. Under accounting principles, the value of these rights was required to be carried on the books at original cost. That does not say that whatever property rights Keystone had actually had a fair value for condemnation purposes of only the nominal amounts carried on books. On March 30, 1967, when PennDOT and Keystone made settlement under their agreement, property which had value was taken from Keystone and its stockholders, so that what remained had less value to the stockholders than what had existed prior thereto. No matter what reasons Penn-DOT may have had in reaching the dollar settlement, it is apparent that under the reasoning of *Pennsylvania Gas & Water Company, supra,* Keystone was entitled to the "repair or replacement value" of that which was taken from it. In this case, what was taken from it were its water rights and some of its property rights in the watershed which would be polluted by the construction of I-80. In its brief the PUC argued that the purpose of the payment of $1,300,000 was to protect the rights of Keystone's customers to a continuing supply of potable water, but the record just does not support that contention. First of all, we can find nothing in the law which would authorize PennDOT to contribute or donate money to anyone, and the PUC cites no such authority. We do find specifically that PennDOT may pay "damages." For example, section 8 of the Pennsylvania Limited Access Highways Act, Act of May 29, 1945, P.L. 1108, *as amended,* 36 P.S. §2391.8, reads in pertinent part as follows:

"For the purpose of constructing limited access highways . . . the Secretary of Highways is hereby empowered to take property and pay damages therefor as herein provided."

Secondly, the record proves beyond cavil that in addition to the cost of constructing the filtration plant, there will be a continuing annual expense of at least $50,000 per year to operate that plant. If the government's intention was to continue a supply of potable water, then why also did it not include payment of $50,000 a year to run the plant. If it had included such payment, then some credence could be given to the PUC's argument.

Throughout its argument, the PUC says that the money PennDOT paid was based upon a "cost to cure" measure of damages, and that somehow this theory of condemnation can be transformed into a principle of rate making. We can find no support for this contention in the law applicable to rate cases.

Another contention of the PUC is that its adjudication in no way affects Keystone's ownership of the filtration plant or the interest of its stockholders therein. Once again, the record does not support such a contention. Two sentences found in the PUC's brief prove our point:

"In such a transaction such stockholders would, indisputably, be free to ask whatever price they should choose for the property of respondent, including the filter plant. In determining such price they would be equally free to set the value of the filter plant at whatever they may wish and should a purchaser subsequently be willing to pay such asking price the stockholders and *not the rate paying customers would be entitled to receive it.*" (Emphasis in original.)

We agree with these statements, and they support the proposition that the stockholders own the filtration plant. Keystone's ratepayers do not own it in any fashion. Counsel for the PUC quite frankly admitted that if Keystone had dissolved its corporate existence on the day

after it received the $1,300,000 that money would have gone to its creditors and any balance to its stockholders. The ratepayers would not have received one dollar of that amount. One of the leading constitutional cases in this field is the decision of the United States Supreme Court in *Board of Public Utility Commissioners v. New York Telephone Co.*, 271 U. S. 23 (1926) where the Court enunciated the principle that the utility plant of a privately-owned utility belongs to its stockholders not to its ratepayers. The Court stated:

> "Customers pay for service, not for the property used to render it. . . . By paying bills for service they do not acquire any interest, legal or equitable, in the property used for their convenience or in the funds of the company." 271 U. S. at 32.

The Court further noted that a utility is entitled to a reasonable return on the value of the property used for public service regardless of the source of the money used to construct the property. In this connection it stated:

> "The just compensation safeguarded to the utility by the Fourteenth Amendment is a reasonable return on the value of the property used at the time that it is being used for the public service, and rates not sufficient to yield that return are confiscatory. . . . Constitutional protection against confiscation does not depend on the source of the money used to purchase the property. It is enough that it is used to render the service." (Citations omitted) 271 U.S. at 31.

These same principles must apply to the PUC's elimination of the annual depreciation applicable to the filtration plant. The company claimed $62,743 for annual depreciation on the original cost of its plant in service on April 30, 1972. Because of the disallowance of the filtration plant, the Commission allowed only $50,669 for total annual depreciation. The difference then is $12,074, which would appear to be the annual depreciation charge

attributable to the filtration plant. In this connection our Superior Court in *Penn Sheraton Hotel v. Pennsylvania Public Utility Commission*, 198 Pa. Superior Ct. 618, 627, 184 A. 2d 324, 328-329 (1962), stated:

> "Annual depreciation is an operating expense representing the consumption of assets in rendering service. A utility is entitled under the law to recover from the rate payers the original cost of construction of its depreciable plant."

This principle was restated by our Court in *Pennsylvania Power & Light Company v. Pennsylvania Public Utility Commission*, 10 Pa. Commonwealth Ct. 328, 311 A. 2d 151 (1973). The PUC takes the attitude that somehow the rights of Keystone and its stockholders are protected by its adjudication despite the elimination of the depreciation applicable to the filtration plant. Nothing could be further from the truth. If we assume this filtration plant had, for instance, a ten-year life, then five years from the day it went into operation, if the company was sold or dissolved, it can be assumed that the selling price would be something substantially less than 100 percent of the value determined on the day it went into service. Under these facts, how could the stockholders of Keystone possibly be protected? They have lost whatever value their company had in that portion of the 37 square mile watershed area which was polluted or taken by virtue of I-80, and they are left with a plant worth less than the amount which had been determined to be the appropriate damages under the condemnation agreement. A failure to recognize this is clearly an error of law because the PUC's adjudication results in a taking of Keystone's property. There is no way that the PUC can support its conclusion that the $1,300,000 payment by PennDOT became the property of the rate payers. If further proof were needed, we point out the fact that if this filtration plant had cost $2,000,000 rather than $1,300,000, can there be any question even under the

PUC's reasoning that $700,000 would have to be placed in the rate base in this case. That being so, does that mean that the rate payer would have some right against Penn-DOT or against Keystone for not computing sufficient damages? We know of no such right.

The PUC bases its approach to this case on the alleged inequity of taxpayers paying money damages to Keystone which are utilized in the construction of a filtration plant and thereafter the rate payers paying a second time through depreciation and earnings on the value of that plant. Although it does not negate the PUC equity argument, we should not lose sight of the fact that apparently 90 percent of the state's payment of these damages was paid by the federal government. We also should not lose sight of the fact that it was for the benefit of the public that I-80 was constructed. So all of the people in the area, including the consumers of Keystone, obtain the benefit of the use of the new public super highway. Be that as it may, the PUC has advanced the novel theory that a privately-owned public utility may be forced to operate a plant representing 20 percent of its net investments in total plant without any earnings whatsoever. The PUC, under its adjudication, of course, permits Keystone to recover the expenses involved in operating this filtration plant, but under the cost of service rate-making process a utility *earns* nothing on expenses. A utility earns only on the net fair value of its plant. In other words, if a person would receive as a gift or through inheritance a public utility, according to the PUC adjudication that person would be under a duty to operate the plant for the benefit of the consumers without the possibility of earning any profit. That kind of reasoning flies in the face of our Supreme Court's holding in *Scranton, supra*. In *Peoples Natural Gas Company v. Pennsylvania Public Utility Commission*, 153 Pa. Superior Ct. 475, 34 A. 2d 375 (1943), it was argued that if a utility had accumulated a depreciation

reserve while consistently earning and paying liberal dividends, that the consumers or rate payers should become the real owners of the property bought with the depreciation funds and ought not to pay a return on it. The Superior Court answered that argument as follows:

"But this ought-not argument can be disposed of by pointing out that, under the existing law, the only test is present fair value of the property used and useful in rendering the service. That appellant [the utility] owns the property and is using it in the service is unquestioned. And, so long as present fair value is the test, it makes no difference whether appellant bought it, received it as a gift, or won it in a lottery." 153 Pa. Superior Ct. 486, 34 A. 2d at 381.

Our appellate courts have consistently held that the source of the funds used to finance the construction of the property used in the public service by a public utility must be included in the rate base. In *Beaver Valley Water Company, supra,* the Commission had excluded from the rate base the cost of construction of a dam by a water public utility, the money for which came from a railroad pursuant to an agreement for the taking of the utility's property. In overruling the Commission the Court held:

"It matters not who paid for it if it forms part of the appellant's [utility's] plant and is used in connection with the public service. It is no part of our duty to measure the value of the consideration given by appellant under said agreement. If the railroad company had built the entire dam in return for such consideration, the appellant would have been entitled to have had its value included in the valuation of its property for rate-making purposes." 76 Pa. Superior Ct. at 263-264.

"It follows that as the order of the Commission would require the appellant to render its service to the public at rates based upon the value of only $985,-

000, when for rate-making purposes its property devoted to the public use is valued at over $1,475,000, it is confiscatory and in violation of the due process clause of the federal Constitution." 76 Pa. Superior Ct. at 272.

In *Borough of Lewistown v. Public Service Commission,* 80 Pa. Superior Ct. 528, 531-532 (1923), the Court stated:

"[T]he commission is not restricted to allowance of a fair return upon the amount of capital actually invested by the owners. . . . The true rule is that the company is entitled to a rate which will allow a just and reasonable return on the present fair value of its property used and useful in the public service. . . ." (Citations omitted.)

The only exception which we have been able to discover to this general constitutional principle is for true donations or contributions made by customers toward the cost of facilities necessary to obtain service by those customers. For example, if a customer is beyond the permitted extension distance of a utility service necessitating construction of facilities which all of the customers of the company should not be made to bear, then the customer contributes or donates that portion of the service facility beyond the permitted distance and for obvious reasons, the utility should not be permitted to earn upon such an investment by the customer. In such cases the cost of such an investment in facilities by the customer properly should be carried on the books of the utility as a donation or contribution and not as part of its plant. The case before us is not such a situation.

As part of its adjudication, the PUC found fault with the manner in which Keystone accounted for the payment of the $1,300,000 from PennDOT. Keystone placed this money, for accounting purposes, in account No. 401 entitled "Miscellaneous Credits to Surplus." Regarding account No. 401, the Pennsylvania Uniform System of Accounts provides that:

"Any difference between the amount received from the sale of land or land rights, less agents' commissions and other costs incident to the sale and the book cost of such land or rights, shall be charged to account 414, Miscellaneous Debits to Surplus, or credited to account 401, Miscellaneous Credits to Surplus, as appropriate."

Because the PUC deemed the $1,300,000 payment to be more a contribution or donation to the consumers (although the consumers were not mentioned anywhere in the agreement), the PUC ordered Keystone to transfer the funds to another account, No. 265, entitled "Contributions in Aid of Construction." Concerning account No. 265, the Pennsylvania Uniform System of Accounts provides:

"This account shall include donations or contributions in cash, services or property from states, municipalities or other governmental agencies, individuals and others for construction purposes."

While the niceties of this accounting issue are not dispositive of this case, we direct the PUC to the holdings mentioned in this opinion, which we believe support the accounting procedure used by Keystone.

In summary then, we hold that the payment of $1,300,000 to Keystone by PennDOT was a payment in money damages or just compensation for the taking of Keystone's property as measured by the value of the land taken, the value of the deeded water rights taken, and also for the replacement costs involved in insuring the continuance of supply of potable water to Keystone's customers, the latter damages of which were measured by the "cost to cure" method. Upon payment of those damages, the money was properly accounted for in the surplus account because that money belonged to the stockholders of Keystone.[3] We hold that the money or

---

3. The record indicates that Keystone did not directly pay for the construction of the filtration plant with the monies it received from PennDOT. The monies were placed into its general funds.

property of the stockholders of Keystone having been invested in a filtration plant used and useful in the public service of Keystone's customers, the value of that plant should have been included in the various original costs, reproduction costs (or trended original costs) and fair value evaluations as part of the total rate base of Keystone for rate-making purposes. We hold that since the filtration plant should be made a part of the rate base for rate-making purposes that annual depreciation should be allowed so that Keystone may recoup this investment over the life of the plant. In view of these holdings, we must reverse the PUC and remand this matter to it for the purpose of amending the cost of service in a manner not inconsistent with this opinion. We therefore

ORDER

AND NOW, this 27th day of May, 1975, based upon the above discussion, the order of the Pennsylvania Public Utility Commission dated April 17, 1974 in the above-captioned matter is hereby reversed and this matter is remanded back to the Commission for the purpose of amending its rate base statistic so as to include the fair value of the filtration plant constructed on the White Deer Creek, to amend its allowance for annual deprecia-

---

At the time of the building of the filtration plant on White Deer Creek, Keystone was also building another plant on the Susquehanna River at a comparable cost. During the period of time when the money ($1,300,000) was being paid and the White Deer Creek filtration plant was being constructed, Keystone also financed the construction of the other filtration plant, and the record indicates that Keystone used both the monies raised by the bond issue and the PennDOT damage settlement payment as general funds for both constructions. In other words, it was not possible to trace the PennDOT payment directly to the White Deer Creek filtration plant. But there is no question that the PennDOT payment was not paid out as extraordinary dividends, but rather was utilized in the construction of the plants for service to Keystone's customers.

tion so as to include annual depreciation in an amount sufficient to permit the recovery of the investment in the filtration plant located on White Deer Creek for the life of that plant, and to amend its cost of service statistics so as to show these two amendments with the resultant increased return and total allowable operating revenues, and it is further ordered that after the recalculation and amendments are completed, the Commission shall issue a new order providing for the collection of the total revenues allowable through the filing of a new supplement to the tariff effective and collectible under the provisions of the law.

Judge WILKINSON concurs in the result only.

---

DISSENTING OPINION BY JUDGE BLATT:

In reviewing the proposed tariff by the Keystone Water Company—White Deer District (Keystone), the Public Utility Commission (PUC) excluded from the rate base $1,292,000 representing the amount contributed by the Commonwealth, Department of Transportation (PennDOT) as that part of the condemnation award allocable to the construction of a water filtration plant, a necessary functional substitute for the land taken by PennDOT when it constructed Interstate Route 80 across the watershed utilized by Keystone as its water source. Without the filtration plant clean potable water could no longer be supplied to Keystone customers.

The PUC apparently concluded that because Keystone had no investment in the plant the customers should not be subject to a rate increase which would result in their having to pay for the plant twice—once through tax dollars and a second time through rates charged by the utility company. Perhaps more important is the fact that the PUC has refused to subject the paying customers to rate increases where they will not receive improvements in services, and where the company made no business

investment upon which it can equitably claim a right to earnings.

The majority holds that to exclude from the rate base the dollar amount consumed in construction of the new filtration plant would amount to a confiscation of Keystone's property in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 9 and 10 of the Pennsylvania Constitution of 1968. I disagree and must, therefore, respectfully dissent.

The majority relies upon the basic proposition that a utility is entitled to receive a fair return on the fair value of its property used and useful in the public service without regard to the source of the money used to purchase the property, citing *Board of Public Utility Commissioners v. New York Telephone Company*, 271 U.S. 23 (1926) and *Peoples Natural Gas Company v. Pennsylvania Utility Commission*, 153 Pa. Superior Ct. 475, 34 A.2d 375 (1943). However appropriate this proposition may be in the normal case, this is not such a case. And, as I view the PUC's departure from the rule, it is both constitutional and just under the laws of Pennsylvania.

Initially I do not believe that the action of the PUC raises issues of constitutional dimension. It is no longer a constitutional requirement that utilities earn a "fair return" on the "fair value" of the property devoted to the public use. What the Constitution requires is that rates be "just and reasonable" so as to provide the equity owners a return commensurate with other enterprises having corresponding risks. *Federal Power Commission v. Hope Natural Gas Company*, 320 U.S. 591 (1944); *Cities Service Gas Co. v. Federal Power Commission*, 155 F. 2d 694 (10th Cir. 1946). These requirements are distinguished in that the return upon the individual or collective values of property no longer determines the constitutionality of a rate schedule; it is determined instead

by the justness and reasonableness of the impact of the final rate upon the utility. The return, therefore, should be sufficient so as to allow the regulated company to operate successfully, maintain its financial integrity, attract capital, and compensate its investors for the risks assumed. *See Federal Power Commission* and *Cities Service Gas Co., supra.* There is not even a suggestion that under this constitutional standard the return allowed by the PUC in this case was not sufficiently met. It seems to me, therefore, that what this Court should have determined is whether or not the PUC ruling fell within the Commission's statutory authority.

Under the Public Utility Law[1] (Act) "[e]very rate made, demanded, or received by any public utility . . . shall be just and reasonable." Section 301 of the Act, 66 P.S. §1141. Under judicial interpretation "just and reasonable" have been construed so that a utility might receive a fair return upon the fair value of that which it employs for the public convenience. *Scranton v. Scranton Steam Heat Company,* 405 Pa. 397, 176 A.2d 86 (1961). On the other hand it cannot be disputed that the words "just and reasonable" indicate that the public is entitled to demand that no more be exacted from it for the use of services rendered by a utility than those services are reasonably worth. *Smyth v. Ames,* 169 U.S. 466 (1898). Are the services of the Keystone here worth any more because they are provided through a new filtration plant constructed out of public moneys? Are the equity investors entitled to any greater return or greater profits as a just and reasonable consequence of the fortuitous condemnation of their watershed where its functional substitute has been provided through public moneys? Surely the answer to both must be in the negative.

---

1. Act of May 28, 1937, P.L. 1053, *as amended,* 66 P.S. §1101 et seq.

The heart and substance of the PUC's determination, and the factor which distinguishes this case from those cited by the majority is the fact that the filtration plant here was constructed with public money designated for that purpose. In those cases cited by the majority the properties included in the rate base were acquired as a result of normal business judgments and investment concepts even though the money used in the acquisitions was not derived from the capital contribution of the equity holders. And, of course, the company should be entitled to reap the benefits of *its* prudent financial decision making. This case lacks similarity for when the condemnation taking occurred Keystone was obligated absolutely to allocate the money received by the condemnation award to the construction of the new filtration plant. The majority departs from this interpretation stating that the condemnation award merely compensates the utility for the taking of the land as in any condemnation case, and thus the majority suggests that the plant was constructed through company investments from a general company fund. Such an interpretation, however, is belied by the express terms of the condemnation agreement and ignores the true character of this unusual situation. As I view the PUC decision, Keystone would not be forced to operate a plant representing 20 percent of its net investments without any earning whatsoever as the majority postulates.

It might be added, as the majority observes, that the PUC did permit Keystone to recover the expenses involved in operating this filtration plant. This was proper, of course, as the company must be permitted to recover its expenses. The majority also observes that the PUC failed to allow Keystone to recover annual depreciation of the plant as an operating expense. Inasmuch as depreciation *is* an operating expense, *Penn Sheraton Hotel v. Pennsylvania Public Utility Commission,* 198 Pa. Superior Ct. 618, 184 A.2d 324 (1962), the PUC should have provided some means by which Keystone could have

recovered this expense through the rate paying customers even though the plant itself was excluded from the rate base.

Because of the need, however, to balance the interests of the equity holders in Keystone against the interests of the rate paying public, I believe that it was just and reasonable for the PUC to exclude the $1,292,000 allocated to the filtration plant from the rate base in this case. I, therefore, dissent.