Pennsylvania Gas and Water Company—Water Division, Petitioner *v.* Commonwealth of Pennsylvania, Pennsylvania Public Utility Commission, Respondent.

144

Argued June 7, 1977, before President Judge Bowman and Judges Crumlish, Jr., Kramer, Wilkinson, Jr., Mencer, Rogers and Blatt. Judge Kramer did not participate in the decision.

*Charles E. Thomas,* with him *D. Mark Thomas, Jack F. Aschinger,* and, of counsel, *Metzger, Hafer, Keefer, Thomas and Wood,* for petitioner.

*Melville G. M. Walwyn,* Assistant Counsel, with him *Daniel F. Joella,* Assistant Counsel, and *Barnett Satinsky,* Acting Chief Counsel, for respondent.

OPINION BY PRESIDENT JUDGE BOWMAN, December 21, 1977:

This case is before us upon a petition for review filed by the Pennsylvania Gas and Water Company (PG&W) which challenges an order, dated July 7, 1976, issued by the Pennsylvania Public Utility Commission (PUC). PG&W is a combination public utility rendering both natural gas and water service.[1] At the end of the test year, September 30, 1974, it provided water service to 128,401 customers representing 144,-559 consumer units.[2] Its service area covers a 165

---

[1] PG&W is a wholly owned subsidiary of Pennsylvania Enterprises, Inc. (PEI), a newly formed holding company having common stock publicly traded on a major stock exchange. PEI, which currently has no other utility operating subsidiaries, was formed for purposes of diversification into nonutility endeavors. PEI's nonutility subsidiary companies are Pennsylvania Energy Resources, Inc. (PERI), a recently formed diversified service and energy resource company, and Theta Land Corporation, a newly formed land development and sales company. Petitioner, PG&W, continues to issue debt and preferred stock publicly under its own name.

[2] The dictinction between customers and consumer units lies in the fact that the former are parties who are billed for service while the latter are families or individuals receiving service.

square-mile area in Northeastern Pennsylvania and includes 60 municipalities. This service area is divided into two divisions, viz, Spring Brook Division and Scranton Division, which are not physically interconnected for the exchange of any appreciable volume of water. Over 60 reservoirs and 1600 miles of water mains make up its distribution system.

On January 17, 1975, PG&W filed Supplements No. 22 and No. 23 to Tariff Water—Pa. P.U.C. No. 3 (Spring Brook Division) and Supplements No. 23 and No. 24 to Tariff Water—Pa. P.U.C. No. 4 (Scranton Division), proposing increases in all existing rates to become effective March 18, 1975. The proposed increases were calculated to produce $2,643,212 in additional annual revenues, exclusive of the State Tax Adjustment Surcharge. This amount would constitute approximately a 20% increase in revenues, with each of two steps in the supplements providing a 10% increase as follows:

*First Step*

| | |
|---|---|
| Supp. No. 22 to Tariff No. 3 (Spring Brook) | $ 769,262 |
| Supp. No. 23 to Tariff No. 4 (Scranton) | 552,344 |
| | $1,321,606 |

*Second Step*

| | |
|---|---|
| Supp. No. 23 to Tariff No. 3 (Spring Brook) | $ 769,262 |
| Supp. No. 24 to Tariff No. 4 (Scranton) | 552,344 |
| | $1,321,606 |

As noted earlier, these supplements were based on a test year ended September 30, 1974, and they totaled $2,643,212. The proposed effective date was voluntarily postponed to March 26, 1975. Supplement No. 22 to Tariff No. 3 and Supplement No. 23 to Tariff No. 4 were not suspended by the PUC and became effective by operation of law on March 26, 1975. By PUC order dated March 25, 1975, docketed at R.I.D. No. 209, Supplements No. 23 to Tariff No. 3 and No.

24 to Tariff No. 4 were suspended to September 26, 1975. By an order dated September 23, 1975, the suspension was extended to December 26, 1975. PG&W voluntarily extended the suspension to January 1, 1976. On December 30, 1975, the PUC set existing rates as temporary rates for a period of 60 days. Through several extensions the temporary rates remained in effect until July 8, 1976. As a result of the PUC's investigation of the reasonableness and lawfulness of the supplements filed by PG&W, including four days of hearings held during July and September of 1975,[3] the PUC, by a 3 to 2 vote issued an order, dated July 7, 1976, which disallowed the entire $1,321,606 second step of the proposed rate increase. It is noteworthy that only PG&W presented any evidence at the hearings. Counsel for the PUC limited his participation to cross-examination of PG&W's witnesses.

In its adjudication, the PUC found a fair value of $87,700,000 and a fair rate of return of 8.53 percent, thus providing income available for return in the amount of $7,482,668. This return, together with the PUC's findings on operating expenses, depreciation, taxes, and other adjustments set forth in the adjudication, led the PUC to conclude that the allowable annual revenues were $14,574,017. This figure is precisely $1,321,606 less than the total revenues sought by PG&W in its filings and results in the precise disallowance of the second step of the proposed increase. A timely petition for review by PG&W brings the PUC's determination before us.

PG&W asserts that the PUC's disallowance of the second step of the proposed increase and its findings as to fair value and fair rate of return are arbitrary,

---

[3] Six formal complaints filed in opposition to the rate increase were consolidated with the Commission investigation for the purpose of hearing and determination. None of these complainants participated to any significant extent at the hearings.

148

capricious, unreasonable and contrary to law and amount to an unconstitutional confiscation of PG&W's property. Our scope of review in PUC cases is limited to a determination of whether constitutional rights have been violated, an error of law committed, or if there is a lack of substantial evidence to support the findings, determination, or order of the PUC.[4]

We may start with the basic proposition that, in the establishment of just and reasonable utility rates under the Public Utility Law (Act), Act of May 28, 1937, P.L. 1053, *as amended*, 66 P.S. §1101 et seq., the utility must be allowed a fair return on the fair value of its property devoted to the service of the public. *Keystone Water Co. v. Pennsylvania Public Utility Commission*, 19 Pa. Commonwealth Ct. 292, 301, 339 A.2d 873, 877 (1975). The establishment of rates which provide less than a fair return on the fair value of such property results in a confiscation of the utility's property in violation of the Fifth and Fourteenth Amendments to the United States Constitution and Article I, Sections 9 and 10 of the Pennsylvania Constitution. *Keystone, supra.*

Turning first to a consideration of the PUC's finding of the fair value of PG&W's property, we must agree with PG&W that the finding reflects arbitrary and capricious action on the part of the PUC and a manifest abuse of its discretion. As noted earlier, PG&W was the only party to present any evidence at

---

[4] The appellate scope of review in PUC cases was formerly found under Section 1107 of the Public Utility Law, Act of May 28, 1937, P.L. 1053, *as amended*, 66 P.S. §1437. The scope of review provisions of that section were repealed by the Act of October 7, 1976, P.L. 1057, §20. Prior to its repeal, however, Section 1107 was suspended by Pa. R.A.P. 5105(c), while Pa. R.A.P. 1551(b) simultaneously adopted, in our view, the scope of review as it existed under Section 1107 and the case law. *See, e.g., Johnstown-Pittsburgh Express, Inc. v. Public Utility Commission*, 5 Pa. Commonwealth Ct. 521, 291 A.2d 545 (1972).

the proceedings before the PUC. PG&W presented evidence that its total net original cost (original cost depreciated) for both divisions amounted to $72,054,-977. PG&W presented evidence that its trended original cost depreciated[5] at five-year average prices was $198,098,094.[6] Based on the average of these measures of value at original cost depreciated and trended original cost at five-year average prices, PG&W contended that the fair value of its plant should be $135,076,535. After criticizing some of the price indices and methodology used by PG&W in its trending, the PUC, without making any formal or specific adjustments to any of PG&W's original or trended cost figures, set a fair value at $87,700,000.

At the outset, we note that the PUC's failure to make any specific adjustments to PG&W's cost figures affords us no insight into the precise weight given the various cost elements by the PUC in arriving at fair value. Although this does not frustrate our review in the circumstances of the present case, it does make our task most difficult and we once again admonish the PUC to disclose in some detail in its adjudications the figures upon which its conclusions are based and the methods employed in arriving at those conclusions.

The law governing fair value determinations by the PUC was aptly summarized by this Court in the last rate case before us involving PG&W, *Pennsylvania Public Utility Commission v. Pennsylvania Gas and*

---

[5] Trended original cost depreciated provides a value approximately equivalent to reproduction cost depreciated and constitutes an acceptable substitute for average price reproduction costs. *Pittsburgh v. Pennsylvania Public Utility Commission*, 187 Pa. Superior Ct. 341, 349 n.5, 144 A.2d 648, 653 n.5 (1958).

[6] PG&W also presented evidence that its trended original cost at three-year average prices was $210,406,882. However, only the five-year figure was used by PG&W to calculate the fair value figure submitted to the PUC by PG&W.

*Water Co., (PG&W I)*, 19 Pa. Commonwealth Ct. 214, 341 A.2d 239 (1975). Writing for the Court, Judge KRAMER stated:

> The fair value figure represents a judgment to be made by the PUC within its discretion, and there is no magical mathematical formula to which the PUC is bound in determining fair value. . . . The PUC must consider all relevant elements and factors having a bearing on fair value, including original cost and trended original cost. . . . In Pittsburgh v. Pennsylvania Public Utility Commission, 171 Pa. Superior Ct. 187, 195, 90 A.2d 607, 612 (1952), our Superior Court stated:
>
>> 'The weight to be given any particular measure of value, such as original cost or reproduction cost [trended original cost], is for the Commission, but its action must be within the area of its administrative discretion and supported by the evidence.'

*PG&W I, supra* at 228, 341 A.2d at 248 (citations omitted).

Judge KRAMER went on to note:

> From our reading of the Act, we are certain only that the sole use of original cost statistics or the sole use of reproduction costs statistics would violate the legislative intent. We have no doubt that the Legislature intended an averaging process somewhere between the two extremes, and, so long as the fair value set by the PUC is not below or above those two extremes, or arbitrarily set so close to either extreme that we can discern a capricious disregard of the evidence or the law, we will not interfere.

*Id.* at 230, 341 A.2d at 249.

In *PG&W I*, we held that a fair value which was approximately 150 percent of the net original cost as

found by the PUC could not be said to be an abuse of discretion per se. In the present case, the fair value set by the PUC is approximately 121 percent of the net original cost figure submitted by PG&W and apparently accepted by the PUC as correct.[7] Once again, we decline to conclude that *this figure alone* establishes an abuse of discretion per se, because there may exist a situation, however improbable, in which stability of prices for materials, increased labor productivity, enhanced technological efficiency, or some combination thereof would make reproduction cost sufficiently low that a reasonable fair value figure may exceed net original cost by a lesser percentage. Where, however, there is no direct evidence in the record of such a low reproduction cost and no evidence suggesting the presence of the listed economic factors even approaching the extent necessary to produce such a low ratio of fair value to net original cost, the conclusion becomes inescapable that the PUC arbitrarily and capriciously ignored the evidence or its duty under the law in setting fair value.

In the present case, the divergence between PG&W's asserted fair value and that set by the PUC appears to be rooted in a disagreement over trended costs. Before examining the PUC's specific criticisms of PG&W's trending of costs, it will be helpful to make several computations to illustrate the magnitude of the PUC's disagreement with PG&W's trended cost estimates.

---

[7] The PUC order expressly accepted PG&W's figure of $78,011,-302 for undepreciated original cost. Because PG&W's estimate of $6,924,485 of accrued depreciation applicable to original cost was discussed simultaneously with the estimates of accrued depreciation applicable to trended costs, the PUC order is vague as to acceptance or rejection of this figure. However, since the PUC directed no criticism at this estimate of accrued depreciation applicable to original cost, we will assume it was accepted for purposes of computing the percentage figure in the text.

Traditionally, the PUC fixes fair value at a point near the average of original cost depreciated and trended original cost depreciated. *See Johnstown v. Pennsylvania Public Utility Commission,* 184 Pa. Superior Ct. 56, 133 A.2d 246 (1957); *Pittsburgh v. Pennsylvania Public Utility Commission,* 174 Pa. Superior Ct. 363, 101 A.2d 761 (1954); *Orlosky v. Pennsylvania Public Utility Commission,* 171 Pa. Superior Ct. 409, 89 A.2d 903 (1952). If the PUC had used this approach in the present case, it would have had to employ a trended cost depreciated figure of $103,345,-023 in order to arrive at a fair value of $87,700,000. This would reflect a downward adjustment in PG&W's trended cost figure amounting to $94,743,071. If the PUC had computed fair value by weighting trended cost depreciated at one-third and original cost depreciated at two-thirds of the total, a fair value of $87,-700,000 could be arrived at only by employing a trended cost depreciated figure of $118,990,032. This represents a downward adjustment of PG&W's trended figure amounting to $79,108,062. If, as seems to be the case, the PUC had made no actual revision of PG&W's figures but instead exclusively used weighting of the original cost depreciated and trended original cost depreciated figures submitted by PG&W to arrive at the $87,700,000 fair value figure, PG&W's trended cost figure would have to be assigned a weight of approximately only one-eighth in computing the fair value. As these figures indicate, the fair value set by the PUC reflects very nearly a complete rejection of the trended cost figures submitted by PG&W.

The PUC's rejection of PG&W's figures clearly stems from criticisms of two of the indices used in trending. First, the PUC rejected PG&W's use of the "Handy-Whitman Waterworks Index for reinforced concrete" in trending the concrete and masonry components of its reservoirs. In its order, the PUC stated:

In consideration of the fact that the depreciated original cost of respondent's reservoirs comprise nearly 20 percent of the total depreciated original cost of respondent's depreciable property, we believe that respondent's engineer should have attempted to develop his own index using component weightings applicable to reservoir construction. Most preferably, respondent's engineer should have used information from respondent's recent reservoir construction experience, if possible.

Our position regarding respondent's use of the Handy-Whitman Index is based upon the following points: (1) It could not be established that the Handy-Whitman Index was designed to be applied to dam construction. Respondent's engineering witness stated on the record that the application for which this index was developed is not designated by Handy-Whitman. (2) The Handy-Whitman Index contains no element of contractor's equipment in its development. We consider it unlikely that a concrete dam could be constructed without the use of contractor's equipment. (3) The labor component of the Handy-Whitman Index accounts for 65 percent of the index weight, of which approximately one-half is represented by common labor. Respondent's engineer stated on the record that the amount of common labor used in concrete or masonry dam construction would be negligible. (4) The Handy-Whitman Index is not available prior to the year 1912, and a significant amount of respondent's reservoir construction occurred before that year. For these reasons we do not consider respondent's use of the Handy-Whitman Index in trending the concrete and masonry elements of respondent's reservoirs to be completely appropriate.

Second, the PUC rejected PG&W's choice of an index to trend certain labor costs:

> For the purpose of developing composite indexes to trend the material and installation labor for certain portions of respondent's property, such as pumps, motors, and pump and filter piping, respondent's engineer has chosen the Engineering News-Record (E.N.R.) 20-Cities Index to repesent the labor element in the composite indexes. In recent decisions regarding water utilities, this Commission has held the opinion that, insofar as possible, company, local or at least Pennsylvania material and labor rates should be used in the development of indexes to reflect as accurately as possible the experience of the company. The record in these proceedings reveals that, in developing indexes to be applied to the aforementioned elements of respondent's property, respondent's engineer made no attempt to develop skilled labor indexes from wage rates in or around respondent's area due to the relative unimportance of the property involved. Regardless of the significance of the property to be trended, the position of the Commission remains unchanged. Consequently, we do not consider respondent's use of the E.N.R. 20-Cities Index for skilled labor to be completely appropriate in these proceedings.

These were the only two significant criticisms of PG&W's figures and, as noted, the latter related to property of "relative unimportance." At no point in the order did the PUC attempt to explain, by way of other evidence, alternative indices, or calculations, how it arrived at its selection of fair value after rejecting PG&W's trended figures. It simply noted that it would take its criticisms "into consideration" in the conclusion of its order.

Because the PUC's criticism of PG&W's trending of reservoir construction costs involved nearly 20 percent of the total depreciated original cost of PG&W's depreciable property, we are certain that a fair value finding substantially lower than the $135,076,535 asserted by PG&W could normally be sustained as a reasonable exercise of the PUC's judgment. In the present case, however, the PUC's finding of fair value reflects a 35 percent downward adjustment from PG&W's asserted fair value. As our examination of the record discloses, the reservoir property of PG&W constituted approximately only 24 percent of the total estimate of depreciated *trended* original cost at five-year average prices. In the absence of any other significant criticisms of PG&W's figures and the absence of any evidence of other factors tending to belie PG&W's estimates and evidence of cost and fair value, the setting of fair value at *as low a level* as was done by the PUC would appear to be both unsupported by the evidence and beyond the bounds of its discretion.[8] We are convinced of the accuracy of this conclusion by the presence of one additional consideration in this case.

As noted earlier, PG&W was party to a water service rate case before this Court in early 1975. *PG&W I, supra.* That case had its origins in the filing by PG&W, on January 30, 1973, of supplements to its water tariffs based on a test year ended September 30, 1972. The case was before the PUC in 1973 and

---

[8] Even if the PUC found trended reservoir construction costs to be zero, PG&W's other trended costs would still total over $150,-000,000. Our prior discussion of the types of "adjustments" to the trended cost figures needed to reach a fair value of $87,700,000 indicates that even this large an adjustment would not be sufficient to reach that figure. For example, a fair value set at the average of $72,054,977 and $150,000,000 would be $111,027,488. It is thus obvious that an extremely large additional and unexplained "adjustment" must have been made by the PUC.

1974 and resulted in a PUC order dated July 9, 1974. Evidence was presented by both PG&W and the complainants as to all measures of value. After considering all of the evidence, the PUC set a fair value, as of September 30, 1972, at $102,000,000. On appeal to this Court, in an opinion dated May 27, 1975, we held that while our review led us to believe that the PUC's finding of fair value was low, it could not be said to be an abuse of discretion per se. *PG&W I, supra* at 227, 341 A.2d at 247-48. We also concluded, however, that the PUC had erred in the exclusion of $2,558,634. from the original cost measure of PG&W's rate case, a sum representing a damage settlement payment by the Pennsylvania Department of Transportation to PG&W for damages to one of its watersheds. We remanded the case to the PUC for recomputation of the rate base and such other measures of value as were effected by inclusion of this sum in the rate base.

It is true that orders of the PUC fixing rates are not res judicata nor are its findings of fair value conclusive for the future since the law contemplates a reexamination of these matters as conditions change. *Duquesne Light Co. v. Pennsylvania Public Utility Commission*, 176 Pa. Superior Ct. 568, 107 A.2d 745 (1954); *Philadelphia v. Pennsylvania Public Utility Commission*, 173 Pa. Superior Ct. 38, 95 A.2d 244 (1953); *Beaver Valley Water Co. v. Pennsylvania Public Utility Commission*, 140 Pa. Superior Ct. 297, 14 A.2d 205 (1940); *Baltimore and Ohio Railroad Co. v. Pennsylvania Public Utility Commission*, 135 Pa. Superior Ct. 20, 4 A.2d 628 (1939). Moreover, as we stated in *PG&W I, supra* at 225, 341 A.2d at 246-47, "the Commission's responsibility is to determine fair value as of the end of the test period used in *this* rate case. What may have been fair value at another time is not necessarily fair value 15 years later." (Emphasis in original.) Also in *PG&W I,* we concluded that a

utility which seeks to use a finding of fair value from a previous case as a minimum or starting point for the PUC's determination of fair value has the burden of proving that factual circumstances have not changed subsequent to the previous rate case. *PG&W I, supra* at 224-25, 341 A.2d at 246-47. In sum, although prior findings of fair value are not conclusive, we do believe that where a utility can show the non-occurence of change in factual circumstances having the effect of reducing the value of its property and where there has been no showing that the PUC acted under some mistake as to fact or committed an error of law in the previous rate case involving the utility, the previous finding of fair value provides a limit on the range of the PUC's discretion in setting fair value in the subsequent rate case. *Cf. Baltimore and Ohio Railroad Co. v. Pennsylvania Public Utility Commission, supra* at 24, 4 A.2d at 630; *Cheltenham & Abington Sewerage Co. v. Public Service Commission,* 122 Pa. Superior Ct. 252, 264-65, 186 A. 149, 156 (1936). (The cited authorities place the converse burden upon complainants seeking in a second proceeding to challenge the legality of rates set in a previous proceeding to which they were a party.)

Here, only two years had elapsed between the ends of the test years upon which the filings of supplements were based in *PG&W I* and the present case. In the present case, PG&W introduced detailed cost and fair value figures and no contradictory evidence was adduced by the PUC or any complainant. The PUC's criticism of PG&W's use of the Handy-Whitman Index to trend reservoir construction was a repetition of an *identical criticism* made by the PUC in *PG&W I*. Moreover, two significant criticisms voiced in the PUC orders involved in *PG&W I*, relating to the component percentages used in developing indices for trending pipeline installation and reservoir earthwork costs and to useful life estimates for certain pipelines, were

corrected to the PUC's satisfaction in the present case. Our review of the record in the present rate proceedings and our examination of *PG&W I* convinces us that PG&W has adequately shown the absence of any change in factual circumstances which would justify any substantial downward deviation from the fair value finding in *PG&W I*. There has been no showing that the PUC acted under a mistake of fact or committed an error of law which resulted in the fair value finding of $102,000,000 made in *PG&W I* being *excessive*. In fact, this Court ordered the PUC in *PG&W I* to add $2,558,634 to the rate base. Additionally, PG&W made well over $3,000,000 at original cost in additions to its plant between the ends of the test years involved here. In view of all of these factors, we find it incredible that the PUC could set $87,700,000 as the fair value in the present proceedings. We can only conclude that it was the result of a manifest abuse of discretion amounting to an error of law.

Normally, we would remand this case to the PUC for further proceedings. However, assuming without deciding that the fair rate of return set by the PUC at 8.53 percent is correct, we note that a fair value finding of $95,157,104 is sufficient to support the reasonableness of the entire proposed rate increase. Based upon the considerations set forth in the immediately preceding portion of this opinion, it is our conclusion that under no permissible view of the facts or law involved in this case could the PUC reasonably conclude that the fair value of PG&W's property used in providing water service to the public is less than that value necessary, when multiplied by a rate of return of 8.53 percent, to support as just and reasonable the entire rate increase proposed by PG&W.[9]

---

[9] Where confiscation is alleged and shown, the Court may make its own finding of fair value. *Duquesne Light Co. v. Pennsylvania*

In view of our conclusion, we will remand the case to the PUC with an order directing the PUC to enter an order dismissing the complaints and allowing, as permanent rates, each of the rates proposed in the supplements filed by PG&W.[10]

In view of the foregoing, we need not consider PG&W's challenge to the PUC's finding as to fair rate of return. Finally, we note that the PUC attempted to justify its overall decision on the ground that it permitted a 17.28 percent return on "original cost common equity invested solely in water operations (excluding acquisition adjustment of $14,600,000)." Although we are uncertain of the meaning of this phrase and its role in rate proceedings, we are certain that "original cost common equity" is not a proper measure of the reasonableness of rates insofar as it employs exclusively an original cost measure of value. The standard of a "fair return on the fair value of property used and useful in the service of the public," remains as the ultimate standard governing rate-making in this Commonwealth.[11]

Judge KRAMER did not participate in the decision in this case.

---

*Public Utility Commission, supra; Solar Electric Co. v. Pennsylvania Public Utility Commission,* 137 Pa. Superior Ct. 325, 9 A.2d 447 (1939). Additionally, where the fair value is clearly in excess of that sufficient to support rates as reasonable, no specific finding of fair value or rate of return is necessary. *Johnstown v. Pennsylvania Public Utility Commission, supra.*

[10] Pa. R.A.P. 1561 provides:

(a) General rule.—The court may affirm, modify, vacate, set aside or reverse any order brought before it for review, and *may remand the matter and direct the entry of such appropriate order,* or require such further proceedings to be had, *as may be just under the circumstances.* (Emphasis added.)

[11] This case, following the death of Judge KRAMER, who had originally been assigned to it, was reassigned to President Judge BOWMAN.

## ORDER

Now, December 21, 1977, the order of the Pennsylvania Public Utility Commission at R.I.D. No. 209 is hereby reversed insofar as it disallowed Supplement No. 23 to Tariff Water—Pa. P.U.C. No. 3—Spring Brook Rate Area and Supplement No. 24 to Tariff Water—Pa. P.U.C. No. 4—Scranton Rate Area.

It is further ordered that the Commission issue an order dismissing the complaints filed in this matter and allowing the above named supplements and designating them as permanent rates.

Insofar as the Commission's order at R.I.D. No. 209 designated as permanent rates the rates filed under Supplement No. 22 to Tariff Water—Pa. P.U.C. No. 3—Spring Brook Rate Area and Supplement No. 23 to Tariff Water—Pa. P.U.C. No. 4—Scranton Rate Area, the order is affirmed.