West Penn Power Company, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Commonwealth of Pennsylvania, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent.

Argued September 15, 1977, before President Judge BOWMAN and Judges CRUMLISH, JR., WILKINSON, JR., MENCER, ROGERS and BLATT.

*W. Russel Hoerner,* with him *Morgan, Lewis & Bockius; Frank L. Morgal;* and, of counsel, *Norman T. Hayes, Jr.,* for West Penn Power Company.

*Philip P. Kalodner,* Special Assistant Attorney General, with him *Robert P. Kane,* Attorney General, for Commonwealth.

*Edward Munce,* Assistant Counsel, with him *Daniel F. Joella,* Assistant Counsel, and *Barnett Satinsky,* Chief Counsel, for Pennsylvania Public Utility Commission.

OPINION BY PRESIDENT JUDGE BOWMAN, January 26, 1978:

These cross appeals bring before us for review an order of the Pennsylvania Public Utility Commission (PUC) dated July 7, 1976, disallowing in its entirety the second step of a two-stage tariff supplement filed by West Penn Power Company (West Penn), the appellant at No. 1592 C.D. 1976. The appellant at No. 1665 C.D. 1976 is the Commonwealth as a customer protes-

tant before the PUC in the rate proceedings culminating in the contested PUC order.

On October 1, 1974, West Penn filed with the PUC a two-stage tariff supplement, the first stage of which was designed to increase operating revenues by $9,-912,950. or 4.9% based upon the level of operations as of June 30, 1974, the end of the test year employed by West Penn in its projections. The second stage would increase operating revenues an additional $15,-005,900. (7.3%) or a total increase in revenues of $24,-918,850., an overall percentage increase of 12.2% above those of the test year.

The first stage increases were not suspended, they became effective November 30, 1974, and are presently being charged to customers. The second stage proposed tariffs were suspended by the PUC for two successive periods from November 26, 1974 to August 30, 1975. Since then to the date of the PUC order from which these appeals were taken, these second stage tariffs were, by order of the PUC, designated as temporary rates.

This rate proceeding before the PUC was bitterly contested by a host of protestants, including individual customers of West Penn, industrial customers and state and local government customers. Twenty-one months have expired between the tariff filing and the issuance of the PUC order here contested. Most unfortunately for all concerned, this case must be remanded to the PUC because of its failure to make adequate factual determinations in support of its conclusion that West Penn's second stage tariff supplement should be denied in its entirety. Without supporting explanation or reason, the majority of the Commissioners simply concluded that West Penn's fair value is $816,225,000. and that a reasonable rate of return thereon is 7.92%, which conclusion produced the remarkable result of disallowing to the dollar West

Penn's second stage tariff supplement. While such a conclusion as to fair value and fair rate of return may be justified, the result it produced not only makes it suspect but, more importantly, the want of adequate discussion and critical findings of fact leading to the conclusion does not enable us to perform our judicial role. To pass upon the merits of these appeals on the present record before us would cast us in the role of making an independent judgment on the merits based upon the whole record before us, a role not given to us by law nor one which we are qualified to assume.[1] At the conclusion of the rate proceedings, the PUC staff was directed to, and some time later did, present its report and a proposed order to be considered by the Commissioners at a public meeting on July 7, 1976, the date of the PUC order in issue. The staff report would have allowed over the first stage tariff supplement an additional $8,450,000. of operating revenues of the $15,005,900. sought by West Penn. In itself, this staff report is not controlling nor are the Commissioners bound to accept it in whole or in part. Its significance in these appeals lies in the fact that the staff report and recommended order, consisting of over 100 pages, comprise, with several exceptions hereinafter noted, the order of the PUC in question and was adopted in principle by the minority opinion of the Commissioners.

The dominant difference found in the PUC order and that of the dissenting Commissioners directs itself to the reserve capacity of West Penn as the result of its completion of a new generating capacity at its Harrison Unit No. 3 for use in December 1974. In the PUC order, as in the staff report, the generating ca-

---

[1] *Pennsylvania Gas and Water Co. v. Pennsylvania Public Utility Commission*, 33 Pa. Commonwealth Ct. 143, 148 n. 4, 381 A.2d 996, 999 n. 4 (1977) ; *Pennsylvania Public Utility Commission v. Pennsylvania Gas and Water Co.*, 19 Pa. Commonwealth Ct. 214, 341 A.2d 239 (1975).

pacity of West Penn is detailed, discussed at length relative to present and future needs and as to complaints of protestors asserting an excessive reserve capacity that should not be charged to present customers. After factually posturing and discussing this issue, the order on this point concludes that West Penn's reserve capacity is excessive and that "[e]xcess capacity must be considered in determination of our fair value of plant for rate making purposes," a view not wholly shared by the minority report. However, it is not this finding itself nor the fact that the minority Commissioners disagreed with it that is of controlling significance. Rather it is the total want of the application of this finding, except by ultimate conclusion, to West Penn's fair value or its fair rate of return vis-a-vis the second step tariff supplement. One searches in vain to the ultimate conclusion of the order as to the impact of a finding of excess reserve capacity. In reviewing the conclusion that West Penn's fair value is fixed at $816,225,000., we are informed only that West Penn's excess reserve capacity has been taken into consideration. We are left uninformed and free to speculate as what percentage of West Penn's reserve capacity has been found to be excessive and the impact of this "excess" upon West Penn's fair value of plant.

Without detailing all the pertinent parts of the order, similar statements and critical unsupported conclusions are found in this order. For example, with respect to the fair rate of return as influenced by cost of borrowed money and equity capital, excess reserve capacity is also mentioned. It is stated in that portion of the order dealing with fair rate of return that the finding of excess reserve capacity "shall be taken into consideration" and that the cost of money "probably would have been lower had not West Penn obtained funds to increase reserve capacity." Having

been advised that this factor is to be taken into consideration and that West Penn's cost of money would probably have been lower if it had not invested in excess reserve capacity, we again are left wholly uninformed as to how this was taken into consideration in the ultimate finding of a fair rate of return of 7.92% on fair value of $816,225,000. and the "probability" of increased cost of capital is left at just that. The minority opinion of the dissenting Commissioners aptly delineates the shortcomings of the order in question.

It states:

It is incomprehensible how the majority can conclude, without the benefit of an analysis of the changes in all figures of the staff report, that respondent is entitled to no additional increase in rates merely because questions were raised about reserve capacity. The key question is what would be the allowable operating revenues if changes were made to all figures in the staff report to delete the effects of Harrison Unit No. 3. That question cannot be answered, as the majority did, by an arbitrary assumption that the temporary-rate level would be the level of the permanent rates. It is the duty of this Commission to base its orders upon facts, and without an analysis of the changes in all figures of the staff report, the action of the majority on July 7, 1976, was without support or justification. The staff was directed to prepare an order reaching the conclusion that the temporary-rate level would be the permanent level of rates, and this can be done only by ignoring the facts, departure from principles of regulatory law and reaching unsupportable conclusions.

In *Pennsylvania Gas and Water Co. v. Pennsylvania Public Utility Commission, supra* note 1, we faced

a similar dilemma but were able to decide the case under circumstances there present. We said:

> At the outset, we note that the PUC's failure to make any specific adjustments to PG&W's cost figures affords us no insight into the precise weight given the various cost elements by the PUC in arriving at fair value. Although this does not frustrate our review in the circumstances of the present case, it does make our task most difficult and we once again admonish the PUC to disclose in some detail in its adjudications the figures upon which its conclusions are based and the methods employed in arriving at those conclusions.

33 Pa. Commonwealth Ct. 143 at 149, 381 A.2d 996; 999 (1977).

In this case, however, we are frustrated in the performance of our judicial review of a PUC order which can only be remedied by remand. In an attempt to persuade us to pass upon the merits of these appeals, the PUC argues that we should give full recognition to the "pragmatic adjustment" theory applied by Federal Courts in review of rate making body adjudications as expressed in *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591 (1944), and *Federal Power Commission v. Natural Gas Pipeline Co. of America*, 315 U.S. 575 (1942). This theory has never been adopted in Pennsylvania for the reason that the applicable statutory law pertaining to the right of a public utility to a fair rate of return upon a fair value, the role of the PUC to pass upon a rate application and to support its action with an adjudication meeting the standards of an administrative adjudication, and the role of a court in reviewing the same does not permit pragmatism to play any role that it may play in Federal decisions under the *Hope* doctrine.

410

As these appeals must be remanded, we do not pass upon the merits of either of them.

ORDER

Now, January 26, 1978, the order of the Pennsylvania Public Utility Commission of July 7, 1976, the subject of these appeals, is hereby set aside and these proceedings are remanded to the Commission for the purpose of its review and revision of said order and, if necessary, modification thereof, consistent with this opinion to the end that its discussion, findings of fact and conclusions of law are sufficiently comprehensive and adequate to enable this Court on review thereof to determine the merits of any appeal from such revised order.

All rights of appeal are preserved to those who heretofore appealed from the order of July 7, 1976, if timely taken from the revised order of the Commission hereby directed to be issued in these proceedings.

