385 A.2d 946

**KEYSTONE WATER COMPANY, WHITE DEER DISTRICT**

v.

**PENNSYLVANIA PUBLIC UTILITY COMMISSION, Appellant.**

Supreme Court of Pennsylvania.

Argued May 3, 1976.

Decided April 7, 1978.

Rehearing Denied May 17, 1978.

596

Edward J. Morris, Counsel, PUC, Michael P. Kerrigan, Asst. Counsel, PUC, Harrisburg, for appellant.

Ernest R. von Starck, Philadelphia, for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

## OPINION

PER CURIAM.

The Court being equally divided, the order of the Commonwealth Court is affirmed.

POMEROY, J., filed an opinion in support of affirmance joined by O'BRIEN and MANDERINO, JJ.

.

ROBERTS, J., filed an opinion in support of reversal joined by EAGEN, C. J., and NIX, J.

JONES, former C. J., did not participate in the decision of this case.

OPINION IN SUPPORT OF AFFIRMANCE

POMEROY, Justice.

In this public utility rate case, the Pennsylvania Public Utility Commission (PUC) appeals from a decision of the Commonwealth Court to reverse an order of the PUC which had disallowed $57,906 from a general rate increase proposed by the appellee water utility, Keystone Water Company—White Deer District (Keystone). See 19 Pa.Cmwlth. 292, 339 A.2d 873 (1975).* The subscribers to this opinion would affirm the order of the Commonwealth Court.

This case arises from Keystone's filing on August 31, 1972, of a supplement to its existing water tariff. The supplement proposed changes in all metered rates sufficient to produce an increase in annual revenues of $415,477.[1] Pursuant to an investigation of the reasonableness of these rates, the PUC issued an order postponing the effective date of the increase until August 22, 1973; thereafter the new rates were deemed temporary pending a final PUC adjudication. Based upon hearings and the submission of appropriate data, the Commission entered a detailed final order on April 17, 1974. Of Keystone's $423,356 requested increase in revenues (as revised), $365,450 or 86 per cent was permitted. This decrease of $57,906 is principally explained by the fact that the PUC excluded from the computation of the rate base the value of Keystone's White Deer Creek filtration plant; the Commission also eliminated from allowable operating ex-

---

* The Public Utility Commission petitioned this Court for leave to appeal under Sec. 204 of the Appellate Court Jurisdiction Act, Act of July 31, 1970 P.L. 673, No. 223, art. II, 17 P.S. § 211.204(a), and we granted the petition.

1. This sum constituted a 48 per cent increase over the level of operations for the test year ending April 30, 1972. Since 1927, Keystone has had one general rate increase, that one becoming effective on November 13, 1958.

penses the annual depreciation chargeable to the plant. This determination by the PUC to ignore Keystone's filtration plant for rate-setting purposes is the single issue in this appeal.

To appreciate the basis for the Commission's action, some background is necessary. We quote from the summarized facts as set forth in the opinion of the late Judge Kramer, writing for the Commonwealth Court majority:[2]

"For almost 75 years, one of the three sources of water for Keystone was the White Deer Creek watershed (watershed). The area of the watershed above Keystone's intake point is approximately 37 square miles. The watershed was almost entirely forest land and Keystone owned about 1,300 acres in fee. Approximately 10 per cent of the watershed is owned by the Commonwealth and is maintained as state forest land. For the remaining 90 per cent, Keystone holds deeds granting water rights dating back to about 1902, wherein it is stated that Keystone has the complete control and use of all the waters and the right to enter upon the land at all times for the purpose of maintaining its supply of water. This water was so pure that it required no treatment other than the minimal chlorination required by the Department of Health for all public water companies. In 1959 Keystone became aware that the Commonwealth proposed to construct Interstate Highway I–80 through the valley of the White Deer Creek. Keystone advised the Pennsylvania Department of Transportation (PennDOT) of the danger to its water supply but was unsuccessful in attempting to have I–80 rerouted so as not to touch the watershed. As a result of long, involved negotiations with PennDOT concerning Keystone's condemnation rights, an understanding was reached and reduced to a written agreement dated July 18, 1966." 19 Pa.Cmwlth. 292, 295–96, 339 A.2d 873, 874 (1975) (footnote omitted.)

Settlement under the July 18, 1966 condemnation agreement between the Pennsylvania Department of Transporta-

2. A dissenting opinion was filed by Judge Blatt.

tion and Keystone Water Company, the pertinent portions of which are quoted in the margin,[3] was made on March 30, 1967. In the spring of 1968, construction of a new filter plant built at Keystone's expense, as provided by the agreement, was completed. The cost of construction of the plant was $1,100,000. Additional expenses related to the condemnation and the building of the new plant brought Keystone's total investment in the project to approximately $1,300,000, a sum equivalent to that paid by PennDOT to Keystone pursuant to the terms of the agreement. See n. 3, supra.

In its 1974 rate adjudication, the PUC undertook a review of the 1967 PennDOT condemnation settlement. It con-

---

**3.** The July 18, 1966 agreement between Keystone and the Department of Transportation states in relevant part:

"WHEREAS, the construction and improvement of Sections 74, 75 and 76 of said State highway will require the taking by Commonwealth for highway purposes of approximately one hundred thirty (130) acres of the said lands belonging to the Company and will seriously impair the water rights over the balance of the Company's land in said watershed area required for the protection of the waters of White Deer Creek: and

"WHEREAS, it has been agreed between Commonwealth and the Company that the just compensation, to which Company is entitled by reason of said taking of its land, the impairment of its water rights as aforesaid and the cost to insure the continuance of the supply of potable water to the said communities which Company serves, is one million three hundred thousand ($1,300,000.00) dollars, which is to be made payable in accordance with the terms and conditions hereinafter set forth in this agreement.

 * * * * * *

"1. Company, upon execution of this agreement, will at its own cost and expense commence the preparation of plans and designs for the construction of such facilities as may be necessary to insure the continued purity, as required for public consumption of the waters of White Deer Creek in Union County, Pennsylvania, and shall submit such completed plans and designs to the appropriate regulatory agencies of the Commonwealth within a period of six (6) months from the date of the execution of this agreement.

 * * * * * *

"4. Commonwealth will pay to the Company the sum of one million three hundred thousand ($1,300,000.00) dollars immediately upon receipt of the executed deed [for 130 acres of Keystone's land] required in paragraph numbered 3 hereof and notice of the award by Company of the contract or contracts for the construction of the facilities as provided for in paragraph numbered 2 hereof." (Emphasis added).

strued the terms of the parties' written agreement as compensating Keystone only for the value of 130 acres of land to which PennDOT took title.[4] The remainder of the amount paid in settlement ($1,292,347), according to the PUC, was intended to remedy "consequential damages" suffered not by the utility, but by its ratepaying customers. As support for this theory, the PUC in its memorandum order pointed to the agreement provision requiring the utility company to construct a filter plant which would restore the potability of the White Deer Creek water supply. The Commission thus ordered that $1,292,347 be excluded from the calculation of rate base.

On appeal, the Commonwealth Court rejected the PUC theory and held as follows:

"[T]he payment of $1,300,000 to Keystone by PennDOT was a payment in money damages or just compensation for the taking of Keystone's property as measured by the value of the land taken, the value of the deeded water rights taken, and also for the replacement costs involved in insuring the continuance of supply of potable water to Keystone's customers, the latter damages of which were measured by the 'cost to cure' method. Upon payment of those damages, the money was properly accounted for in the surplus account because that money belonged to the stockholders of Keystone. We hold that the money or property of the stockholders of Keystone having been invested in a filtration plant used and useful in the public service of Keystone's customers, the value of that plant should have been included in the various original costs, reproduction costs (or trended original costs) and fair value evaluations as part of the total rate base of Keystone for rate-making purposes. We hold that since the filtration plant should be made a part of the rate base for rate-making purposes that annual depreciation should be allowed so that Keystone may recoup this investment over the life of the plant. In view of these holdings, we must

4. The original cost of this acreage was $2,609, to which was added $5,044 representing other unidentified expenses attributable to that property.

reverse the PUC and remand this matter to it for the purpose of amending the cost of service . . .." 19 Pa.Cmwlth. at 310–11, 339 A.2d at 882. (footnote omitted).

For reasons stated in Part I of this opinion, we concur in the holding of the Commonwealth Court that Keystone's filtration plant must be included in rate base for purposes of calculating allowable return on investment, as well as allowable depreciation expense. In Part II, we address the principal argument put to us by the PUC in the instant appeal, *viz.*, that the Commission is free to depart from adherence to the rate base method of utility rate adjudication wherever the end result (i. e., the revenue which the utility is permitted to earn) is deemed to be "just and reasonable."

## I.

We find no legal or factual support[5] for the conclusion of the PUC that most of the dollars representing Keystone's filtration plant were not damages properly belonging to Keystone as compensation for the 1966 taking of its watershed land and valuable easement rights,[6] but were "consequential damages" owing to utility consumers and thus excludable from Keystone's rate base. It is our view that the proper interpretation of the PennDOT-Keystone agreement of July 18, 1966 is that it represents a settlement negotiated by the parties thereto pursuant to established

5. The scope of appellate review of a PUC order is limited by § 1107 of the Public Utility Law, Act of May 28, 1937, P.L. 1053, *as amended*, 66 P.S. § 1437:

"The order of the commission shall not be vacated or set aside, either in whole or in part, except for error of law or lack of evidence to support the finding, determination, or order of the commission, or violation of constitutional rights."

See *Philadelphia Suburban Water Co. v. Pa. P.U.C.*, 425 Pa. 501, 508, 229 A.2d 748, 752 (1967).

6. For a discussion of the value of these rights, see the opinion of the Commonwealth Court herein, 19 Pa.Cmwlth. at 303, 339 A.2d 873. We note that such rights have been held to be properly includable in rate base. See *Beaver Valley Water Co. v. Public Service Commission*, 76 Pa.Super. 255 (1921); *P.U.C. v. York Water Co.*, 44 P.U.C. 1, 77 P.U.R.3d 113 (1968).

condemnation principles, and that the proceeds therefrom were thus the property of Keystone and its shareholders.

It is true, as is emphasized in the Commission's order, that the agreement was intended to insure the "continuance of a supply of potable water to the communities which [the] Company serves." That feature of the settlement, however, was simply reflective of applicable condemnation law, which envisions that the injured utility will remedy the damage done to its service capacity. In *Pa. Gas & Water Co. v. Pa. Turnpike Commission,* 428 Pa. 74, 236 A.2d 112 (1967), this Court ruled that land held for reservoir purposes by a water utility was to be compensated for, when condemned by the Turnpike Commission, on a basis of cost to "replace or repair", rather than the more typical "fair market value" calculation of damages. See also *McSorley v. Avalon Borough School District,* 291 Pa. 252, 139 A. 848 (1927). This was principally because there existed no market for such utility property. 428 Pa. at 83, 236 A.2d 112. In the present case, it was certainly no less difficult to arrive at a market value for Keystone's watershed property. The parties accordingly chose to settle on this "cost to cure" basis.[7] That the parties went a step further and agreed that the condemnee would in fact repair the damage done to its watershed by constructing facilities to insure continued purity of the water supply does not alter the fact that the settlement figure represented compensation for Keystone's loss, not a gift or donation by PennDOT to either Keystone or its

7. One of the references in the record to this mode of expressing the measure of damages in cases of this sort is contained in a letter from the Chief Counsel of PennDOT to the United States Department of Transportation. The letter states in part:

"A review of the laws pertaining to Eminent Domain in Pennsylvania convinces me that if this can be done on a cost to cure basis, there is nothing legally incorrect with this approach, particularly when, as in this matter, other methods of compensation would result in prohibitively high payment." (Record at 280.)

See also the opinion below, 19 Pa.Cmwlth. at 297 n.2, 339 A.2d at 873.

No estimate of the cost of purification facilities is in the record or referred to in the agreement. Thus Keystone's obligation to construct a treatment plant was not conditioned on the cost thereof, which might have been either greater or less than $1,300,000.

customers.[8] The Public Utility Commission in its rate adjudication effectively rewrote the Keystone-PennDOT agreement so as to delete the provision granting compensation in the sum of $1.3 million, representing the watershed value of the condemned acreage (including value derived from deeded easements) and inserted in its place a provision bestowing a gratuity in like amount on Keystone customers. We believe that in so doing it committed error.

■ The PUC argues, however, that its order was compelled by equitable considerations which also dictate the affirmance of that order. It is argued that to permit Keystone to obtain a return on the filter plant is to confer a windfall on the utility to the detriment of the rate paying public. We cannot agree with this assertion. The PUC's equity argument seems to reflect concern with the disparity between the carrying value of the land and water rights taken or destroyed by the condemnation, and the amount agreed upon in settlement, coupled with the fact that this amount bears a close correlation to the cost of the new plant. But the matter must be seen in context. The fact is that the water rights taken, whatever their cost of acquisition many years ago, were of unique value to Keystone, and only to Keystone. The current value of these property rights was not ascertainable by conventional methods because there was obviously no market for them at the time of condemnation. Keystone was sufficiently farsighted at the turn of the century to procure easements which were extensive enough to assure a plentiful source of pure water, a supply kept untouched by polluting influences with which our land and streams are today afflicted. It should not be penalized because of the fact that the only standard of compensation for the loss of such an asset is the amount necessary to be spent in order to accomplish by artificial means what formerly was accomplished by natural means.

8. As the Commonwealth Court noted, 19 Pa.Cmwlth. at 303–04, 339 A.2d 873, there is no authority for any such donation by PennDOT; rather it is empowered, for example, "to take property and pay damages." Limited Access Highways Act, Act of May 29, 1945, P.L. 1108, § 8, *as amended,* 36 P.S. § 2391.8.

That this amount is substantially greater than the original investment of Keystone in its property rights is an irrelevancy, and in no wise converts the settlement with Penn-DOT from damages for a taking into a voluntary contribution. Without the construction of the new plant the customers of Keystone would have been without drinking water (a circumstance caused by PennDOT, not Keystone); thus they have been benefited by that construction. It does not seem unjust that the rates charged to consumers should be increased to reflect the costs of obtaining purity by artificial rather than natural means. Conversely, for Keystone and that portion of the public who are its shareholders to be left with an asset on which no return and no depreciation are to be allowed for purposes of rate-making would mean that it has virtually nothing to show for the taking of its valuable rights to a protected watershed. That result would indeed seem unjust.

Furthermore, we think it pertinent to observe that it is basic to Pennsylvania utility rate law that calculations of rate base must include *all* property rightfully belonging to a utility company which is used and useful in service to the public. See *Scranton v. Scranton Steam Heat Co.*, 405 Pa. 397, 401, 176 A.2d 86, 88 (1961); *Lower Paxton Township v. Pa. P.U.C.*, 13 Pa.Cmwlth. 135, 140, 317 A.2d 917, 920 (1974). This is so irrespective of the source or cost of the property. Thus, in *Scranton, supra,* our Court held that the PUC erred in valuing a steam heating plant at the fortuitous price the utility paid to acquire it; the much higher original cost of construction and the even higher cost of present reproduction were to be considered as well. 405 Pa. at 402–03, 176 A.2d 86. Similarly, in *Beaver Valley Water Co. v. Public Service Commission,* 76 Pa.Super. 255, 263–64 (1921), it was held that the fact that the source of funds for the construction of a dam abutment was furnished by a third person was irrelevant to rate base valuation: "It matters not who paid for it if it forms part of appellant's plant and is used in connection with the public service. It is no part of our duty to measure the value of the consideration given by appellant under said agreement." See also *Peoples Natural Gas Co. v.*

*Pa. P.U.C.*, 153 Pa.Super. 475, 34 A.2d 375 (1943); *Borough of Lewistown v. Public Service Commission*, 80 Pa.Super. 528 (1923).[9]

 In the present case, the utility's filtration plant is devoted to providing adequate water service to the public. That the capital invested in that facility is traceable to a payment of damages for injury to the company's water supply is immaterial for rate-setting purposes.[10] We conclude, therefore, that the value of this item of Keystone's utility property must be restored to rate base and must be considered for purposes of calculating depreciation expense. See *Scranton, supra*, 405 Pa. at 403–04, 176 A.2d 86.[11]

## II.

To put in context the Commission's principal argument in this case, it is helpful to review briefly some first principles

9. The PUC would have us view the facts in this case as analogous to a situation where the utility constructs a facility with funds donated by its own customers. The Commission has in its own adjudications held that such a facility is excludable from rate base. See, *e. g., P.U.C. v. Pa. Power & Light Co.*, 34 P.U.C. 581, 14 P.U.R.3d 438 (1956). Suffice it to say that the utility in this case has received a "donation" from neither its customers nor anyone else.

10. Indeed, prior to this case, the P.U.C. has specifically so held. See *McCarney v. Rouzerville Water Co.*, 1 P.U.R.3d 204 (1953); *Burgettstown v. West Penn Water Co.*, 29 P.U.C. 410 (1951).

11. The PUC argues that the order of the Commonwealth Court must be modified insofar as it directs a remand that does not permit the Commission to reevaluate its finding that 8.5 per cent is the proper rate of return to be applied to rate base. Without such reevaluation, the PUC asserts, the utility company will be permitted annual revenues in excess of the amount it requested.

We are unable to agree that such a modification is appropriate. The issue before the PUC is limited to the tariff supplement filed by the utility. *See* Sec. 308 of the Public Utility Law, *supra*, 66 P.S. § 1148. Furthermore, we note that the 8.5 per cent rate of return found by the Commission was arrived at independently of rate base by careful calculation of Keystone's cost of capital, including embedded cost of long-term debt, preferred stock and common equity. As was pertinently stated in *Pittsburgh v. Pa. P.U.C.*, 158 Pa.Super. 229, 240, 44 A.2d 614, 618 (1945), "The rate [of return] should not be reduced merely to compensate for a relatively high finding of fair value [of rate base]."

of utility rate adjudication in Pennsylvania. In the first place, Section 301 of the Public Utility Law, *supra*, 66 P.S. § 1141, sets forth the fundamental criterion that "[e]very rate made, demanded, or received by any public utility . . . shall be just and reasonable." Our courts have consistently held that the process of implementing this standard and determining allowable revenues upon which customer rates are founded is one of calculating the fair value of a utility's property used and useful in public service (termed the "rate base") and multiplying that amount by a percentage figure called "rate of return" (most frequently determined by reference to the company's cost of capital). See, *e. g.*, *Scranton, supra*; *Lower Paxton Township, supra*; *Pittsburgh v. P.U.C.*, 182 Pa.Super. 376, 126 A.2d 777 (1956).[12] Secondly, with regard to the rate base element, ascertainment of the fair value of utility property has required consideration of two approaches to valuation: original cost of construction and cost of reproducing anew the plant facilities. See *Scranton, supra*, 405 Pa. at 402, 176 A.2d 86, and cases cited therein.

 These two precepts, the first relating to the overall method to be used for setting rates and the second to the particular meaning accorded to the term "fair value", have their roots in federal constitutional law. "Rates which are not sufficient to yield a reasonable return on the value of the property used . . . are . . . confiscatory, and their enforcement deprives the public utility company of its property in violation of the 14th Amendment." *Bluefield Water Works v. Public Service Commission*, 262 U.S. 679, 690, 43 S.Ct. 675, 678, 67 L.Ed. 1176, 1181 (1923). "And in order to ascertain that value, the original cost of construction . . . [and] the present as compared with the original cost of construction . . . are all factors to be considered." *Id.* (quoting *Smyth v. Ames*, 168 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898)).

12. The third factor entering into rate adjudication is determination of recoverable operating expenses such as maintenance, depreciation and taxes. See generally, 1 A. Priest, Principles of Public Utility Regulation 45–138 (1969).

As we understand its position, the Public Utility Commission now contends that it is not constrained by the above-outlined rate base/rate of return adjudicatory formula (and thus is free to give no specific consideration to Keystone's filtration plant as an element of rate base) where the end result, *i. e.*, the revenues permitted to be received by the utility, may be deemed to be just and reasonable. This approach is valid, we are told, because the Supreme Court of the United States has effectively overruled *Bluefield, supra,* by holding that it is the result reached, and not the method employed, which is controlling for purposes of constitutional inquiry. See *Federal Power Commission v. Hope Natural Gas,* 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944); *Federal Power Commission v. Natural Gas Pipeline,* 315 U.S. 575, 62 S.Ct. 736, 86 L.Ed. 1037 (1942); cf. *Permian Basin Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). The Commission cites the following from *Hope, supra*:

> "Rates which enable the company to operate successfully, to maintain its financial integrity, to attract capital, and to compensate its investors for the risks assumed certainly cannot be condemned as invalid, even though they might produce only a meager return on the so-called 'fair value' rate base." *Id.* 320 U.S. at 605, 64 S.Ct. at 289.

Since Keystone has allegedly failed to demonstrate that the PUC's order will impair its financial integrity, *etc.,* the Commission asserts that there has been no error in this case.

 We must disagree. Even assuming that the PUC correctly reads the Supreme Court's *Hope* decision,[13] our courts have held that the rate base method of rate-setting is mandated by our statutory law, irrespective of whether the federal constitution would require as much. See *Peoples Natural Gas Co. v. Pa. P.U.C.,* 153 Pa.Super. 475, 488–89, 34 A.2d 375, 382 (1943); *Pittsburgh v. Pa. P.U.C.,* 158 Pa.Super.

---

**13.** As we read *Hope* in its entirety, the constitutional issue therein was limited to a consideration of the above-discussed "fair value" definition of rate base, not the use of the rate base method itself (which was in fact followed by the Federal Power Commission in that case).

229, 235–36, 44 A.2d 614, 616–17 (1945). The legislative intent to prescribe the rate base technique can be garnered from several sections of our Public Utility Law.[14] We are of the view, furthermore, that sanctioning of a free-form "end result" approach to rate-making would be unwise policy. Absent the legal standards implicit in the present rate base/rate of return model, a Commission order and judicial review thereof would be transformed into an uncertain groping for the elusive standards of "justness" and "reason-

**14.** Section 311 of the Public Utility Law, 66 P.S. § 1151 provides:

"The commission may, after reasonable notice and hearing, ascertain and *fix the fair value of the whole or any part of the property of any public utility,* in so far as the same is material to the exercise of the jurisdiction of the commission, and may make revaluations from time to time and ascertain the fair value of all new construction, extensions, and additions to the property of any public utility. When any public utility furnishes more than one of the different types of utility service enumerated in paragraph seventeen of section two of this act, the commission shall segregate the property used and useful in furnishing each type of such service, and shall not consider the property of such public utility as a unit in determining the value of the property of such public utility for the purpose of fixing rates. . . ." (Emphasis added.)

Section 310(d), 66 P.S. § 1150(d), states:

"Whenever the commission, upon examination of any annual or other report, or of any papers, records, books, or documents, or of the property of any public utility, shall be of opinion that any rates of such public utility are producing *a return in excess of a fair return upon the fair value of the property of such public utility, used and useful in its public service,* the commission may, by order, prescribe for a trial period of at least six months, which trial period may be extended for one additional period of six months, such temporary rates to be observed by such public utility as, in the opinion of the commission, *will produce a fair return upon such fair value,* and the rates so prescribed shall become effective upon the date specified in the order of the commission. Such rates, so prescribed, shall become permanent at the end of such trial period, or extension thereof, unless at any time during such trial period, or extension thereof, the public utility involved shall complain to the commission that the rates so prescribed are unjust or unreasonable. Upon such complaint, the commission, after hearing, shall determine the issues involved, and pending final determination the rates so prescribed shall remain in effect." (Emphasis added.)

See also § 310(a), 66 P.S. § 1150(a).

We note that the PUC purported to follow in the present case the rate base/rate of return formula, stating in its order that "Pennsylva-

ableness" (or the equally vague factors identified in the quoted passage from *Hope, supra*). While the judgment of the Commission is entitled to great weight, it should not be effectively conclusive upon a reviewing court. We think it would become so if the ephemeral approach now advocated were to prevail. It is for this reason that several other courts, and commentators as well, have rejected the suggestion that the rate base technique be abandoned. See *Iowa-Illinois Gas & Electric Co. v. City of Fort Dodge*, 248 Iowa 1201, 85 N.W.2d 28 (1957); *Illinois Bell Telephone Co. v. Ill. Commerce Commission*, 414 Ill. 275, 111 N.E.2d 329 (1953); *Petition of New England Tel. & Tel. Co.*, 115 Vt. 494, 66 A.2d 135 (1949); *Commonwealth Telephone Co. v. Public Service Commission*, 252 Wis. 481, 32 N.W.2d 247 (1948); E. McKeage, Public Utility Law Regulation 74–80 (1956); Priest, *supra*, at 139–190; Joslin & Miller, "Public Utility Rate Regulation: a Re-Examination", 43 Va.L.Rev. 1027, 1031–1049 (1957); Rose, "Valuation for Rate-making", 47 Minn.L.Rev. 1, 25 (1962); Welch, "Rate Base is Here to Stay!", 52 Pub.Util.Fort. 635 (1953); *Contra, City of Detroit, Michigan v. Federal Power Commission*, 97 U.S.App. D.C. 260, 230 F.2d 810 (1955).[15]

nia regulatory law *requires* that consideration be given to measures of value [of a utility company's plant] . . . ." (Emphasis added.)

**15.** The opinion in support of reversal seems to assume that the principal issue in this appeal is the continued vitality of the so-called "fair value" concept as a means of determining valuation of the property of a public utility for rate making purposes. See *Scranton v. Scranton Steam Heat Co., supra*, 405 Pa. at 401, 176 A.2d 86. We think the other opinion misperceives the issue. The issue is the continued vitality of the rate base/rate of return adjudicatory formula as the approach to ascertaining just and reasonable rates for public utilities to charge. That formula requires the inclusion of the utility's properties in rate basis at a proper value. In Pennsylvania that value has been denominated in a short-cut fashion as "fair value". See *Scranton, supra*. But in the case at bar the Public Utility Commission totally ignored the utility's filtration plant in its determination of rate base, giving it a zero valuation. In attempted justification, it argues that the traditional formula heretofore used in utility rate making in Pennsylvania is no longer viable, but must give way to some other approach to just and reasonable rates. That is the issue presented in the case, directed solely to what rate will allow the utility to operate successfully.

We realize, of course, that our traditional approach to rate-making has not reached the status of a science and that some pragmatic weighting of various factors is necessarily involved. We remain unpersuaded, however, that abandonment of the rate-base approach and the concept of fair return based thereon would be useful or helpful in the complicated process of utility rate-making, or that such a change in our law and practice is required in the public interest. We therefore must reject the Commission's argument that the value of Keystone's new purification plant can be ignored in the setting of its water rates.

We would affirm the order of the Commonwealth Court.

O'BRIEN and MANDERINO, JJ., join in this opinion.

## OPINION IN SUPPORT OF REVERSAL AND REINSTATEMENT OF THE ORDER OF THE PUC

ROBERTS, Justice.

Today the Opinion of Mr. Justice Pomeroy grants appellee Keystone Water Company the right to reap from its customers—industrial, municipal, and individual—an unjustified bonanza of rate increases. The Opinion of Mr. Justice Pomeroy accomplishes this unfortunate result by requiring appellant Public Utilities Commission to permit Keystone Water to include in its rate base a $1.3 million water filtration plant paid for by the public, and not Keystone Water.

The Opinion of Mr. Justice Pomeroy justifies the inclusion of the publicly funded plant in Keystone Water's rate base by dusting off the outmoded, unworkable "fair value" rule of ratemaking discarded nearly forty years ago by the federal courts and likewise rejected by the vast majority of state courts and then by requiring the PUC to adhere strictly to the "fair value" rule despite the PUC's statutory authority to utilize any ratemaking device which will produce "just and reasonable" rates. The Opinion of Mr. Justice Pomeroy utilization of the "fair value" rule permits Keystone Water to charge arbitrary, fluctuating, and infla-

tionary rates based on the hypothetical current market value of Keystone Water's original investments, rather than the accurate, predictable rates, based on Keystone Water's actual investments, produced by a "just and reasonable" standard.

Even worse, the Opinion of Mr. Justice Pomeroy misapplies the "fair value" rule by treating the publicly funded water filtration plant as a capital expenditure of Keystone Water, thus allowing depreciation on the publicly funded structure. Even the "fair value" rule does not permit such an extreme windfall. The Opinion of Mr. Justice Pomeroy's extraordinary application of the unwise and roundly rejected "fair value" rule, the misconception of the proper treatment of the publicly funded water filtration plant, and the second-guessing of the PUC compels dissent.

## I

## THE PUC PROPERLY DISALLOWED KEYSTONE WATER'S EXTRAVAGANT RATE INCREASE

For over seventy-five years, Keystone Water has provided water to residents of Northumberland and Union Counties. Keystone Water has a current capacity of nearly three million gallons and supplies approximately 7,500 customers.

At the turn of the century Keystone Water acquired realty and water rights comprising the White Deer Creek Basin. Water from White Deer Creek, one of Keystone Water's three principal sources of supply was so pure that only chlorination was required before delivery to Keystone Water's distribution system. In 1968, however, the Commonwealth constructed Interstate Route 80 through a portion of the creek's watershed, interfering with the purity of the creek. The Pennsylvania Department of Health determined that Keystone Water would have to filter the water from White Deer Creek to maintain its potability. The Commonwealth paid Keystone Water $1,300,000 for the taking of watershed property and injury to the water supply. Keystone Water used this public payment to construct a

water treatment plant. Keystone Water now wants the PUC to treat the publicly funded water filtration plant as though Keystone Water, rather than the public, paid for it. It is on this theory that Keystone Water claims a right to include the plant in its rate base and to charge its customers for depreciation.

On August 31, 1972, Keystone Water filed with the PUC a supplement to its schedule of rates, seeking approval of a 48% increase in annual operating revenues, from $865,814 to $1,281,291.[1] Keystone Water proposed that the rates become effective November 1, 1972, but later voluntarily postponed the effective date until November 22, 1972.

On November 20, 1972, the PUC suspended Keystone Water's supplement for six months.[2] On May 21, 1973, the PUC suspended the supplement for another three months to August 22, 1973,[3] to hold hearings on complaints filed by customers of Keystone Water alleging that the proposed rate increase was unjust, unreasonable, and discriminatory. The PUC ordered on August 17, 1973 that rates existing before Keystone Water filed its supplement remain in force pending determination of the proposed rate increase.[4] The PUC heard argument on February 20, 1974.

On April 17, 1974, the PUC entered an order rejecting $57,906 of Keystone Water's proposed rate increase as unwarranted. The PUC concluded that Keystone Water improperly included the publicly funded White Deer Creek water filtration plant as an asset for purposes of ratemaking:

> "For rate-making purposes, we cannot permit respondent to receive all of the salutary effects of the land

1. The supplement was required by the Public Utility Law, Act of May 28, 1937, P.L.1053, § 308(a), 66 P.S. § 1148(a) (1959). See Part IIA infra.

2. Such suspensions are authorized by the Public Utility Law, § 308, 66 P.S. § 1148(b).

3. See id.

4. See id.; id., § 310, 66 P.S. § 1150.

condemnation and pass them on to the stockholders while passing on all of the deleterious effects of the condemnation to the rate-payers. Clearly, it was not the bare value of the land, in vacuo, for which $1,300,000 was paid as compensation by the Commonwealth. By far, the greater amount of the payment resulted and stemmed from consideration of the land's dedication to public use as a water utility, and recognition of the injury to the interests of the water utility customers. Apparently, the customers of White Deer quite properly were recognized by the parties to the agreement as being in the nature of a third party beneficiaries whose interest in public utility water service had been injured; and accordingly, it was agreed by the parties that to heal the injury to the interests of the customers and restore the former usefulness of the land, i. e., to restore the precondemnation status quo as nearly as possible, the filtration plant must be provided for the customers. To reflect equitably and meaningfully this near restoration of, or equitable substitution for, the precondemnation status quo, both the utility and its customers must be made whole insofar as reasonably possible. This we have done. As a result of our treatment of the condemnation proceedings, the customers' rates remain unchanged by the condemnation and respondent's financial stability and ability to serve remain unchanged."

Following its long-standing policy of refusing to allow a utility to gain unjustifiably by charging customers for depreciation of property not acquired by capital expenditures, the PUC also denied that part of Keystone Water's rate increase based on depreciation of the water filtration plant.

Keystone Water appealed the order of the PUC to the Commonwealth Court, contending that the PUC erroneously excluded the filtration plant and depreciation on the plant from Keystone Water's rate base. The Commonwealth Court reversed and remanded with instructions that the PUC amend its calculation of the rate base to include the "fair value" and depreciation of the filtration plant whose construction was publicly funded.

## II

### THE OPINION OF MR. JUSTICE POMEROY READS THE PUBLIC UTILITY LAW OUT OF CONTEXT, IGNORES THE FEDERAL EXPERIENCE WITH JUDICIAL REVIEW OF RATE DETERMINATIONS, AND MANDATES THE PUC TO APPROVE RATES DETRIMENTAL TO ALL CUSTOMERS

The Opinion of Mr. Justice Pomeroy affirms the decision of the Commonwealth Court on the ground that the "fair value" rule is required by the Public Utility Law, §§ 310(d) and 311, 66 P.S. §§ 1150(d) and 1151. In the context of the PUC's rate-making functions, however, the Opinion of Mr. Justice Pomeroy's interpretation of these sections is wholly implausible. "Fair value," as commonly defined, see infra note 7, requires regulatory bodies to allow utilities to charge rates reflecting a return on the assumed cost of reproducing a utility's property. Experience has shown that the Opinion of Mr. Justice Pomeroy's adoption of this rule as a matter of state administrative law will cause unending and unnecessary fluctuations in rate structures, unending judicial involvement with rate determinations, and unjustifiably high rates, to the great detriment of all customers of a utility.

### A

### THE PUBLIC UTILITY LAW REQUIRES THE PUC TO SET "JUST AND REASONABLE" RATES, AND NOT RATES BASED ON "FAIR VALUE"

The Public Utility Law defines persons or corporations owning or operating equipment in the Commonwealth and engaging in certain activities as "public utilities," Public Utility Law, § 2(17), as amended, 66 P.S. § 1102(17), and subjects these utilities to regulation by the PUC. Id., § 201, 66 P.S. § 1121. The Law vests in the PUC general administrative powers and requires the PUC to "enforce, execute, and carry out" the Law. Id., §§ 901 and 902, 66 P.S. §§ 1341 and 1342.

The Law prescribes a standard of justness and reasonableness for every rate of public utilities. Section 301 provides:

*"Rates to be just and reasonable*

Every rate made, demanded, or received by any public utility, or by any two or more public utilities jointly, shall be just and reasonable, and in conformity with regulations or orders of the commission . . . ."

Id., § 301, 66 P.S. § 1141. Utilities must adhere to the schedule of rates approved by the PUC, id., § 303, 66 P.S. § 1143, may not discriminate against persons, corporations, or municipal corporations in fixing rates, id., § 304, 66 P.S. § 1144, and cannot demand advance payment of rates from customers, id., § 305, 66 P.S. § 1145.

Section 309 of the Law, 66 P.S. § 1149, requires the PUC to determine the "just and reasonable" rates to be charged by a public utility whenever it finds, either upon its own motion or upon complaint, that existing rates are unjust or unreasonable.[5] The Law also provides that the PUC may conduct an investigation of proposed changes in rates to determine whether such rates are just and reasonable. Id., § 308(c), 66 P.S. § 1148(c).[6] The Law places upon the public utility the burden of proving the justness and reasonable-

**5.** Section 309 provides:
"Whenever the commission, after reasonable notice and hearing, upon its own motion or upon complaint, finds that the existing rates of any public utility for any service are unjust, unreasonable, or in anywise in violation of any provision of law, the commission shall determine the just and reasonable rates (including maximum or minimum rates) to be thereafter observed and in force, and shall fix the same by order to be served upon the public utility, and such rates shall constitute the legal rates of the public utility until changed as provided in this act."

**6.** Section 308(c) provides:
"If, after such hearing, the commission finds any such rate to be unjust or unreasonable, or in anywise in violation of law, the commission shall determine the just and reasonable rate to be charged or applied by the public utility for the service in question, and shall fix the same by order to be served upon the public utility; and such rate shall thereafter be observed until changed as provided by this act."

ness of proposed increases in rates, id., § 312, 66 P.S. § 1152, and empowers the PUC to order a public utility to refund to customers the difference between rates charged and rates which are "just and reasonable," with interest. Id., § 313(a), 66 P.S. § 1153(a).

The Law also authorizes the PUC to fix temporary rates in either of two principal manners. If the PUC, during rate proceedings brought either by the PUC or upon complaint, determines that the public interest so requires, it may establish a temporary rate of return of no less than five per cent per year on the original cost less depreciation of physical property devoted to public use. Id., § 310(a), 66 P.S. § 1150(a). Second, if upon examination of reports or other documents, the PUC determines that existing rates produce a rate of return in excess of "a fair return upon the fair value of the property of such public utility" devoted to public use, the PUC may for a trial period of up to twelve months reduce existing rates to what it determines to be a fair return. Id., § 310(d), 66 P.S. § 1150(d). Rates so prescribed "shall become permanent at the end of such trial period . . . unless at any time during such trial period . . . the public utility involved shall complain to the commission that the rates so prescribed are unjust or unreasonable."

Thus, the Legislature has authorized the PUC to lower rates temporarily to account for reduced market worth of a utility's property. Rates so lowered by the PUC may be challenged only on the ground that they are not "just and reasonable."

The Opinion of Mr. Justice Pomeroy's reliance upon Section 310(d) is unjustified. This section does not require, as the Opinion of Mr. Justice Pomeroy does, that the PUC utilize "fair value" principles in every instance; it merely authorizes the PUC to lower rates whenever it deems those rates excessive in light of changed economic circumstances.

Nor does Section 311, 66 P.S. § 1151, in any fashion support the Opinion of Mr. Justice Pomeroy. Section 311 provides:

*"Valuation of property of a public utility*

The commission may, after reasonable notice and hearing, ascertain and fix the fair value of the whole or any part of the property of any public utility, in so far as the same is material to the exercise of the jurisdiction of the commission, and may make revaluations from time to time and ascertain the fair value of all new construction, extensions, and additions to the property of any public utility. When any public utility furnishes more than one of the different types of utility service enumerated in paragraph seventeen of section two of this act [66 P.S. § 1102(17)], the commission shall segregate the property used and useful in furnishing each type of such service, and shall not consider the property of such public utility as a unit in determining the value of the property of such public utility for the purpose of fixing rates."

Id., § 311, 66 P.S. § 1151. This provision, like Section 310(d), 66 P.S. § 1150(d), authorizes the PUC to determine the fair value of any portion of the property of a public utility. These provisions confer upon the PUC authority to resort to "fair value" principles; "fair value" is not, however, the sole tool available to the PUC for purposes of valuation. Viewed with the Law's "just and reasonable" mandate, these sections indicate a legislative judgment that "fair value" be only one permissible means of appraisal. The Legislature did not intend "fair value" to be used—as the Opinion of Mr. Justice Pomeroy uses it—to create rates of maximum proportions.

The Opinion of Mr. Justice Pomeroy's interpretation is contrary to recent commentary. See C. Pontz & S. Sheller, "The Consumer Interest—Is It Being Protected By The Public Utility Commission?," 45 Temp. L. Q. 315 (1972). The authors conclude:

"[W]hen the Commission, in investigating existing utility rates, is of the opinion that rates are excessive, it may prescribe temporary rates intended to produce a fair return upon fair value. However, when the Commission is

investigating proposed changes in rates, a fair value stan-dard should not be considered a statutory mandate." Id. at 323 (footnotes omitted). As the authors emphasize, the PUC is not bound by the "fair value" rule, but rather the PUC is to ensure just and reasonable results.

B

THE OPINION OF MR. JUSTICE POMEROY INTER-PRETS THE PUBLIC UTILITY LAW CONTRARY TO THE WEIGHT OF FEDERAL AND STATE AUTHORITY

The rate-setting mechanism established by the Public Utility Law resembles closely the statutory scheme analyzed in *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944). The Natural Gas Act, 15 U.S.C.A. §§ 717–717u (1976), vests the Federal Power Commission with jurisdiction over the transmission of gas in interstate commerce. Section 717c(a) of the Act provides that all rates and charges made for the transporta-tion or sale of natural gas subject to the jurisdiction of the FPC "shall be just and reasonable, and any such rate or charge that is not just and reasonable" is unlawful. Section 717d(a) authorizes the FPC to determine what constitutes just and reasonable rates, and to reduce such rates whenever they "are unjust, unduly discriminatory, preferential, other-wise unlawful, or are not the lowest reasonable rates." Section 717e(a) provides that the FPC "may investigate and ascertain the actual legitimate cost of the property of every natural-gas company, the depreciation therein, and, when found necessary for rate-making purposes, other facts which bear on the determination of such cost or depreciation and the fair value of such property."

In assessing the proper rate base of the company, the FPC refused to consider either the cost of reproduction, estimated by the company at $97,000,000, or the "trended original cost," estimated, after depreciation, at $66,000,000. The FPC instead found the proper rate base to be $33,700,000, the "actual legitimate cost." On petition for review to the court of appeals, the company contended that the rates based on actual legitimate costs were confiscatory and un-reasonable. The court of appeals agreed, concluding an

actual legitimate cost basis could not produce a fair return to the company.

In reversing, the Supreme Court concluded:

"Rate-making is indeed but one species of price-fixing. *Munn v. Illinois,* 94 U.S. 113, 24 L.Ed. 77 (1877). The fixing of prices, like any other applications of the police power may reduce the value of the property which is being regulated. But the fact that the value is reduced does not mean that the regulation is invalid. *Block v. Hirsh,* 256 U.S. 135, 41 S.Ct. 458, 65 L.Ed. 865 (1921); *Nebbia v. New York,* 291 U.S. 502, 54 S.Ct. 505, 78 L.Ed. 940 (1934) . . .. It does, however, indicate that 'fair value' is the end product of the process of rate-making not the starting point as the Circuit Court of Appeals held. The heart of the matter is that rates cannot be made to depend upon 'fair value' when the value of the going enterprise depends on earnings under whatever rates may be anticipated.

We held in *Federal Power Commission v. Natural Gas Pipe Line Co.,* supra, that the Commission was not bound to the use of any single formula or combination of formulae in determining rates. Its rate-making function, moreover, involves the making of 'pragmatic adjustments.' Id. 315 U.S. at 586, 62 S.Ct. at 743, 86 L.Ed. 1037. And when the Commission's order is challenged in the courts, the question is whether that order 'viewed in its entirety' meets the requirements of the Act. Id. Under the statutory standard of 'just and reasonable' it is the result reached not the method employed which is controlling. . . . It is not theory but the impact of the rate order which counts. *If the total effect of the rate order cannot be said to be unjust and unreasonable, judicial inquiry under the Act is at an end.* The fact that the method employed to reach that result may contain infirmities is not then important. Moreover, the Commission's order does not become suspect by reason of the fact that it is challenged. It is the product of expert judgment which carries a presumption of validity. And he who would upset the rate order under the Act carries the heavy

burden of making a convincing showing that it is invalid because it is unjust and unreasonable in its consequences." *Federal Power Commission v. Hope Natural Gas Co.,* supra at 601–602, 64 S.Ct. at 287–88 (footnote omitted; emphasis added).

"[T]he 'fair value' concept no longer rules the rate-making process, and with its demise the area of dispute about 'confiscation' has shrunken to the vanishing point." W. Gellhorn & C. Byse, Administrative Law 415 (1974). See, e. g., *Federal Power Commission v. Texaco, Inc.,* 417 U.S. 380, 94 S.Ct. 2315, 41 L.Ed.2d 141 (1974); *Federal Power Commission v. Memphis Light, Gas & Water Division,* 411 U.S. 458, 93 S.Ct. 426, 36 L.Ed.2d 426 (1973); *Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968). See also G. Gunther, Constitutional Law, 555 (9th ed. 1975); J. Rose, "The Hope Case and Public Utility Valuation in the States," 54 Colum.L.Rev. 188 (1954); Cook, "History of Rate Determination Under the Due Process Clause," 11 U.Chi.L.Rev. 297 (1944); Hale, "Utility Regulation in the Light of the Hope Natural Gas Case," 44 Colum. L.Rev. 488 (1944); Harbeson, "The Demise of Fair Value," 42 Mich.L.Rev. 1049 (1944). Moreover, the vast majority of state courts have likewise abandoned the fair value rule as a matter of state administrative law. See W. Gellhorn & C. Byse, Administrative Law, supra; W. Jones, Regulated Industries 110–11 (2d ed. 1976); J. Rose, "Confusion in Valuation for Public Utility Rate-Making," 47 Minn.L.Rev. 1 (1962); J. Rose, "The Hope Case and Public Utility Valuation in the States," supra.

Thus the Supreme Court has held, despite the reference to "fair value" in the Natural Gas Act, that the relevant inquiry under the Act is whether the rate determination of the FPC is a "just and reasonable" one. In holding that the FPC's use of actual legitimate cost of a company's assets as a basis for determining rates satisfies both the governing statutory scheme and the Constitution, *Hope* overruled a long line of cases, beginning with *Smyth v. Ames,* 169 U.S.

466, 18 S.Ct. 418 (1898), which required regulatory bodies, as a matter of constitutional law, to allow utilities to earn a "fair return" on the cost of reproducing assets.[7]

7. In *Smyth v. Ames,* 169 U.S. 466, 18 S.Ct. 418, 42 L.Ed. 819 (1898), the Court affirmed the decrees of the circuit court enjoining officials of railroad companies doing business in Nebraska from complying with a Nebraska statute fixing the maximum rates those companies could charge. The decrees, sought by shareholders of the companies, also enjoined Nebraska officials from enforcing the statute. The Court concluded that the statute denied the company the opportunity to earn a reasonable return on the "fair value" of its business:

> "We hold . . . that the basis of all calculations as to the reasonableness of rates to be charged by a corporation maintaining a highway under legislative sanction must be the fair value of the property being used by it for the convenience of the public. And, in order to ascertain that value, the original cost of construction, the amount expended in permanent improvements, the amount and market value of its bonds and stock, the present as compared with the original cost of construction, the probable earning capacity of the property under particular rates prescribed by statute, and the sum required to meet operating expenses, are all matters for consideration, and are to be given such weight as may be just and right in each case. We do not say that there may not be other matters to be regarded in estimating the value of the property. What the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience. On the other hand, what the public is entitled to demand is that no more be exacted from it for the use of a public highway than the services rendered by it are reasonably worth." Id. at 434, 18 S.Ct. at 434.

By the end of World War I, the "fair value" rule entitled a utility to earn a reasonable return on the cost of reproducing assets. See *Utah Power & Light Co. v. Public Service Commission,* 107 Utah 155, 152 P.2d 542 (1944); J. Rose, "The Hope Case and Public Utility Valuation in the States," 54 Colum.L.Rev. 188 (1954).

Justice Butler, writing for the Court in *McCardle v. Indianapolis Water Co.,* 272 U.S. 400, 410, 47 S.Ct. 144, 148, 71 L.Ed. 316 (1926), in an era when the Court was "wholeheartedly in the business of scrutinizing the reasonableness of rates," G. Gunther, Constitutional Law 555 (9th ed. 1975), declared the governing principle of the day: "It is well established that values of utility properties fluctuate, and that owners must bear the decline and are entitled to the increase." Accordingly, the rule sometimes prohibited regulated companies from passing along to consumers the unfavorable effects of excessive investments, e. g., *San Diego Land & Town Co. v. Jasper,* 189 U.S. 439, 23 S.Ct. 571, 47 L.Ed. 892 (1903); *San Diego Land & Town Co. v. City of National City,* 174 U.S. 739, 19 S.Ct. 804, 43 L.Ed. 1154 (1899), and other times allowed regulated companies to benefit from the effects of inflation on original investments, e. g., *McCardle v. Indianapolis Water Co.,* 272 U.S. 400, 47 S.Ct. 144, 71 L.Ed. 316 (1926); *Bluefield Water Works & Improvement Co. v. Public Service Commission,* 262 U.S. 679, 43 S.Ct. 675, 67 L.Ed. 1176 (1923).

By replacing the cost of reproduction standard associated with "fair value" with a standard allowing regulatory bodies to set rates based on a utility's actual, legitimate investment, the Court acknowledged the shortcomings of the "fair value" rule. As Justice Brandeis demonstrated, the rule produced arbitrary and fluctuating results:

"The Constitution does not guarantee to the utility the opportunity to earn a return on the value of all items of property used by the utility or of any of them. The several items of property constituting the utility, taken singly, and freed from the public use, may conceivably have an aggregate value greater than if the items are used in combination. The owner is at liberty, in the absence of controlling statutory provision, to withdraw his property from the public service, and, if he does so, may obtain for it exchange value. . . . But, so long as the specific items of property are employed by the utility, their exchange value is not of legal significance.

The investor agrees, by embarking capital in a utility, that its charges to the public shall be reasonable. His company is the substitute for the state in the performance of the public service, thus becoming a public servant. The compensation which the Constitution guarantees an opportunity to earn is the reasonable cost of conducting the business. Cost includes, not only operating expenses, but also capital charges. Capital charges cover the allowance, by way of interest, for the use of the capital, whatever the nature of the security issued therefor, the allowance for risk incurred, and enough more to attract capital.

\* \* \* \* \* \*

The rule of *Smyth v. Ames* sets the laborious and baffling task of finding the present value of the utility. It is impossible to find an exchange value for a utility, since utilities, unlike merchandise or land, are not commonly bought and sold in the market. Nor can the present value of the utility be determined by capitalizing its net earnings, since net earnings are determined, in large measure, by the rate which the company will be

permitted to charge, and thus the vicious circle would be encountered. So, under the rule of *Smyth v. Ames,* it is usually sought to prove the present value of a utility by ascertaining what it actually cost to construct and install it, or by estimating what it should have cost, or by estimating what it would cost to reproduce or replace it. To this end an enumeration is made of the component elements of the utility, tangible and intangible; then the actual, or proper, cost of producing, or of reproducing, each part is sought; and finally it is estimated how much less than the new each part, or the whole, is worth. That is, the depreciation is estimated. Obviously each step in the process of estimating the cost of reproduction, or replacement, involves forming an opinion, or exercising judgment, as distinguished from merely ascertaining facts. And this is true, also, of each step in the process of estimating how much less the existing plant is worth than if it were new. There is another potent reason why, under the rule of *Smyth v. Ames,* the room for difference in opinion as to the present value of a utility is so wide. The rule does not measure the present value either by what the utility cost to produce, or by what it should have cost, or by what it would cost to reproduce, or to replace it. Under that rule the tribunal is directed, in forming its judgment, to take into consideration all those and also other elements, called relevant facts.

Obviously, 'value' cannot be a composite of all these elements. Nor can it be arrived at on all these bases. They are very different, and must, when applied in a particular case, lead to widely different results. The rule of *Smyth v. Ames,* as interpreted and applied, means merely that all must be considered. What, if any, weight shall be given to any one, must practically rest in the judicial discretion of the tribunal which makes the determination. Whether a desired result is reached may depend upon how any one of many elements is treated. It is true that the decision is usually rested largely upon records of financial transactions, on statistics and calculations. But as stated in *Louisville v. Cumberland Tele-*

*graph & Telephone Co.*, 225 U.S. 430, 436, 32 S.Ct. 741, 742, 56 L.Ed. 1151, 'every figure * * * that we have set down with delusive exactness' is 'speculative.' "

*Missouri ex rel. Southwestern Bell Telephone Co. v. Public Service Commission*, 262 U.S. 276, 290–296, 43 S.Ct. 544, 547–49, 67 L.Ed. 981 (1923) (Brandeis, J., joined by Holmes, J., concurring) (footnotes omitted).

Justice Frankfurter argued that the "fair value" rule destroyed the proper relations between the judicial and administrative processes by making courts the final rate-makers:

> "The force of reason, confirmed by events, has gradually been rendering [the] formula [of *Smyth v. Ames*] moribund by revealing it to be useless as a guide for adjudication. Experience has made it overwhelmingly clear that *Smyth v. Ames* and the uses to which it has been put represented an attempt to erect temporary facts into legal absolutes. The determination of utility rates— what may fairly be exacted from the public and what is adequate to enlist enterprise—does not present questions of an essentially legal nature in the sense that legal education and lawyers' learning afford peculiar competence for their adjustment. These are matters for the application of whatever knowledge economics and finance may bring to the practicalities of business enterprise. The only relevant function of law in dealing with this intersection of government and enterprise is to secure observance of those procedural safeguards in the exercise of legislative powers which are the historic foundations of due process.
>
> Mr. Justice Bradley nearly fifty years ago made it clear that the real issue is whether courts or commissions and legislatures are the ultimate arbiters of utility rates (dissenting in *Chicago, Milwaukee & St. Paul Ry. Co. v. Minnesota*, 134 U.S. 418, 461, 10 S.Ct. 702, 703, 33 L.Ed. 970). Whatever may be thought of the wisdom of a broader judicial role in the controversies between public utilities and the public, there can be no doubt that the

tendency, for a time at least, to draw fixed rules of law out of *Smyth v. Ames* has met the rebuff of facts." *Driscoll v. Edison Light & Power Co.*, 307 U.S. 104, 122–23, 59 S.Ct. 715, 724, 83 L.Ed. 1134 (1939) (Frankfurter, J., joined by Black, J., concurring).[8]

## C

## THE OPINION OF MR. JUSTICE POMEROY IGNORES THE SHORTCOMINGS OF THE "FAIR VALUE" RULE

The Opinion of Mr. Justice Pomeroy today gives "new vitality to the mischievous formula" of *Smyth v. Ames*, see id. at 122, 59 S.Ct. at 724 (Frankfurter, J., joined by Black, J., concurring), by holding that the Public Utility Law requires the PUC to employ "fair value." First, by requiring the PUC to allow Keystone Water to charge its customers rates representing a fair return on the fair value of the White Deer Creek water filtration plant, the Opinion of Mr. Justice Pomeroy requires the PUC to permit arbitrary, fluctuating rates artificially insensitive to inflationary pressures. The water filtration plant is the tangible asset needed to preserve. the quality of the water from White Deer Creek. The plant replaced Keystone Water's asset of nearly perfect water, which had appreciated over the years Keystone Water had been in business. The cost of the water filtration plant is part of the cost to Keystone Water of reproducing its original investment at current market prices.

---

**8.** Criticism of the fair value rule was unending. See *Federal Power Commission v. Natural Gas Pipeline Co.*, 315 U.S. 575, 599, 609, 62 S.Ct. 736, 749, 753, 86 L.Ed. 1037 (1942) (Black, Douglas, and Murphy, JJ., concurring; Frankfurter, J., concurring); *McCart v. Indianapolis Water Co.*, 302 U.S. 419, 423, 58 S.Ct. 324, 326, 82 L.Ed. 336 (1938) (Black, J., dissenting); *West v. Chesapeake & Potomac Telephone Co.*, 295 U.S. 662, 680, 55 S.Ct. 894, 901, 79 L.Ed. 1640 (1935) (Stone, J., joined by Brandeis and Cardozo, JJ., dissenting); *O'Fallon R. Co. v. United States*, 279 U.S. 461, 488, 548, 49 S.Ct. 384, 389, 409, 73 L.Ed. 798 (1929) (Brandeis, J., joined by Holmes and Stone, JJ., dissenting; Stone, J., joined by Holmes and Brandeis, JJ., dissenting); Hale, "Does the Ghost of *Smyth v. Ames* Still Walk?," 55 Harv.L.Rev. 1116 (1942); Hale, "The 'Fair Value' Merry Go-Round, 1898 to 1938," 33 Ill.L.Rev. 517 (1939); Richberg, "Value—By Judicial Fiat," 40 Harv.L.Rev. 567 (1927).

This cost of reproduction is ever-changing, ever-rising, and has nothing to do with the actual, legitimate cost of what Keystone Water dedicated to the public use. By considering the water filtration plant relevant, the Opinion of Mr. Justice Pomeroy places determination of rates in the hands of the market forces which the clear weight of federal and state authority has determined harmful to rate adjudication.

Keystone Water's rates are already sensitive to the inflationary pressures on the cost of new capital investment, labor, chemicals, and other supplies used in purification and delivery of water. Keystone Water may properly increase rates to reflect such increased costs because it incurs these costs in serving customers. Customers should not, however, have to bear the additional burden of inflated, hypothetical costs, not incurred in producing and distributing water, but merely in reproducing Keystone Water's original investment. The publicly funded plant, reproducing Keystone Water's original investment, therefore cannot be the basis for rate increases.

Second, the Opinion of Mr. Justice Pomeroy revives a long discarded standard for reviewing the PUC's determination of proper rates which places courts in the role of rate-makers. Federal courts have found that judicial review of rate determinations under a standard of "fair value" is a frequent, difficult, and unsatisfactory undertaking. A court can more easily determine whether a regulatory body has acted within its statutory and constitutional authority than whether a rate is fair as a matter of initial rate-making law. Limited judicial inquiry relieves the judicial burden, minimizes the likelihood that a court, unfamiliar with critical nuances of a regulated industry, will reach an incorrect result, and "assure[s] requisite flexibility to the officials or agencies designated to discharge the tasks assigned by the [Legislature]." H. Linde & G. Bunn, Legislative and Administrative Processes 523 (1976), citing *New York Central Securities Corp. v. United States*, 287 U.S. 12, 53 S.Ct. 45, 77 L.Ed. 138 (1932) (permitting consolidation of carriers in the public interest); *Federal Power Commission v. Hope Natu-*

*ral Gas Co.*, supra; *National Broadcasting Co. v. United States*, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943) (licensing of radio communications in the public interest); *Lichter v. United States*, 334 U.S. 742, 68 S.Ct. 1294, 92 L.Ed. 1694 (1948) (recovery of excessive profits on war contracts).

The Opinion of Mr. Justice Pomeroy also concludes that "fair value" principles are advantageous because they avoid judicial elucidation of what the Opinion of Mr. Justice Pomeroy refers to as the "elusive standards of 'justness' and 'reasonableness.'" The Opinion of Mr. Justice Pomeroy fails to disclose, however, by what reasoning "fair value" is less "elusive" than the statutorily prescribed standards of "justness and reasonableness." In choosing between two standards, courts must prefer the modern, prevailing standard in the federal and state courts which avoids perpetual adjustments of rates according to market fluctuations irrelevant to a utility's actual investment, allows the regulatory body to set reasonable rates, and properly circumscribes judicial review. The Opinion of Mr. Justice Pomeroy's standard not only forces the PUC to endorse inflated, unjustified rates, but also returns our courts to the days when the economic thinking of judges governed matters better left to legislatures and regulatory bodies. History has taught too valuable a lesson to be forgotten so quickly, or ignored so unwisely.

All customers, industrial, municipal, and individual, will feel the impact of today's decision enhancing the rate base of Keystone Water. The Opinion of Mr. Justice Pomeroy requires the PUC to approve rates reflecting hypothetical increases in the current market value of a utility's property attributable to presumed changes in market conditions, even in an inflationary economy. Thus, the Opinion of Mr. Justice Pomeroy compels customers to pay a utility a higher rate even where the utility has not increased its capital investment, but only its hypothetical value. Utility customers should not be subjected to such unjustified hardship. See *Duquesne Light Co. v. Borough of Monroeville*, 449 Pa. 573, 582, 298 A.2d 252, 257 (1972) (Roberts, J., concurring).

The Public Utility Law's emphasis on the "justness and reasonableness" of rates clearly establishes that whether rates are "just and reasonable" is the sole concern of courts of this Commonwealth in reviewing rate determinations of the PUC. The Opinion of Mr. Justice Pomeroy refuses to draw from the Supreme Court's interpretation of the federal analogue of the Public Utility Law that "justness and reasonableness," rather than "fair value," is the governing principle in rate-making cases.

## III

EVEN THE "FAIR VALUE" RULE DOES NOT CONDONE THE OPINION OF MR. JUSTICE POMEROY'S GRANT OF TODAY'S HUGE WINDFALL

Even assuming that the already disavowed "fair value" rule is the standard for determining utility rates, the Opinion of Mr. Justice Pomeroy has erroneously applied that standard. Before the Commonwealth's condemnation, Keystone Water would have been entitled to a fair return on the cost of reproducing its original investment in the White Deer Creek watershed. This cost would include replacement of a source of water so pure that only chlorination would be required before delivery to Keystone Water's distribution system. To reproduce such a resource, Keystone Water would need a source of water, a filtration plant to bring that water up to comparable standards, and money to operate the plant. See Eminent Domain Code, Act of June 22, 1964, P.L. 84, § 602(a), 26 P.S. § 1–602(a) (Supp.1977).

Accordingly, Keystone Water would be entitled to charge its customers a rate representing a fair return on the value of the source of the water and the filtration plant, and to recover operating expenses for the plant. The Opinion of Mr. Justice Pomeroy however, permits Keystone Water much more—(1) to charge a rate reflecting each of these considerations, and (2) depreciation on the water filtration plant. Thus, by the Opinion of Mr. Justice Pomeroy's misapplication of the "fair value" rule, Keystone Water is elevated to a position much superior to that held before the

Commonwealth paid Keystone Water $1.3 million, used for the construction of the filtration plant. Keystone Water is now entitled to charge its customers twice for the water filtration plant: once for a fair return on the public investment, and again for its depreciation. Keystone Water, under any theory of rate-setting, should not be permitted to charge its customers depreciation on something it never paid for. The PUC, unlike the Opinion of Mr. Justice Pomeroy, correctly recognized Keystone Water's attempt to secure an extravagant windfall and properly refused to allow the requested rate increase.

## IV

## THE PUC'S DETERMINATION IS JUST AND REASONABLE AND SHOULD BE AFFIRMED.

The PUC investigated the supplement of Keystone Water requesting rate increases pursuant to the Public Utility Law, § 308, 66 P.S. § 1148. After hearings, investigations, and argument, the PUC determined that the requested rate increase would require customers to pay a rate of return on the publicly financed White Deer Creek water filtration plant. Accordingly, the PUC decided that the requested rate increase should be decreased by excluding the filtration plant from the rate base.

By the terms of Section 308(c) of the Public Utility Law, Keystone Water would be justified in complaining only if the ultimate rate approved by the PUC was not "just and reasonable." Nothing in the record indicates that the PUC's balancing of the considerations involved in these proceedings was not "just and reasonable." Indeed, the PUC's determination is a proper accommodation of private and public concerns, allowing Keystone Water a just return on its actual investment, and demonstrating a correct and commendable concern for the rate increase's effect on all customers. The PUC correctly refused to allow Keystone Water to charge its customers additional rates based on the publicly funded plant.

The Opinion of Mr. Justice Pomeroy affirms the Commonwealth Court's erroneous reversal of a just and reasonable determination of the PUC. I dissent, would reverse the order of the Commonwealth Court, and would reinstate the order of the PUC.[9]

EAGEN, C. J., and NIX, J., join in this opinion in support of reversal and reinstatement of the order of the PUC.

---

**9.** The Opinion of Mr. Justice Pomeroy errs in asserting that the continuing validity of the "fair value" concept is not before us. See p. 610 at n.15. Only if Keystone Water can charge customers rates based on the cost reproducing original investments can it justify including in its rate base the plant which represents the cost of reproducing its original investment in the White Deer Creek watershed. Keystone Water never paid for the water filtration plant. Because the plant was constructed with public funds, Keystone Water cannot justify including the plant in its rate base on the ground that the plant represents its own capital expenditure.